# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-1398
_____

Rhonda Button

*Plaintiff - Appellant*

v.

Dakota, Minnesota & Eastern Railroad Corporation, doing business as Canadian
Pacific Railway

*Defendant - Appellee*
_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City
_____

Submitted: February 11, 2020
Filed: June 30, 2020
_____

Before SMITH, Chief Judge, COLLOTON and STRAS, Circuit Judges.
_____

SMITH, Chief Judge.

Rhonda Button sued the Dakota, Minnesota & Eastern Railroad Corporation, doing business as Canadian Pacific Railway (CP) under the Missouri Human Rights Act (MHRA) and the Family and Medical Leave Act (FMLA). Specifically, she alleges that CP discriminated against her on the basis of her gender and her use of

FMLA leave when it terminated her. CP contends the termination occurred as part of a reduction in force (RIF) without discriminatory intent. The district court[1] granted summary judgment to CP. We affirm.

## I. *Background*
### A. *Operations Supervisors*

CP is a railway offering transportation services and supply chain expertise across North America. CP's Operations Supervisors manage the safe, efficient, and timely movement of its trains within a designated territory. Their work includes ensuring that train operators have the information needed to safely navigate the territory. An Operations Supervisor's failure to provide the necessary information to the trains may cause delays or potentially serious injuries. An Operations Supervisor must become qualified to dispatch, that is, control the movement of trains at a particular desk.[2] Thus, he or she must be able to dispatch with little, if any, assistance. Before CP's 2016 RIF, 16 Operations Supervisors[3] handled 3 desks in CP's Southern Region: the Missouri desk, the Iowa desk, and the Kansas City desk.

In 2002, Button started working as an Operations Supervisor at the Kansas City desk when it was owned by another railroad company. After CP acquired that railroad in 2008, Button continued to work at the Kansas City desk at the Truman Bridge. Nicole Marthe, Manager of Train Dispatching, supervised Button from April 2011 until her termination. Button was the only female assigned to the Kansas City desk throughout her employment. In February 2016, Heidi Peterson, CP's Director of Train

---

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri.

[2]A desk is "an assignment that covers a specific territory or territories." J.A. 481. Each desk controls its assigned territories and the trains passing through those territories. J.A. 450.

[3]The Operations Supervisors included 14 males and 2 females.

Dispatching, made a two-week trip to fill in at the Kansas City desk. During Peterson's presence, Button recalled Peterson remarking that the Kansas City desk "wasn't a place for a woman." J.A. 129. After Peterson returned home from Kansas City, she messaged Button that she would only move to the Kansas City desk "if they change[d] the bathroom. LOL!" J.A. 1020.

## B. *RIF Decisions*

Also in 2016, CP implemented a RIF. It planned to eliminate the Missouri desk and redistribute the territories associated with that desk to the Iowa and Kansas City desks. Under this plan, CP would eliminate 6 of the 16 Operations Supervisor positions by April 1, 2016. To prepare for the RIF, CP scheduled a meeting to evaluate each Operations Supervisor. Amanda Cobb, a member of Human Resources, e-mailed a spreadsheet with information about each Operations Supervisor to guide discussion during the meeting. Cobb included Peterson on the e-mail. However, Peterson never responded to the e-mail, did not attend the RIF meeting, and gave no input on the RIF terminations. The RIF spreadsheet included each Operations Supervisor's performance management program (PMP) rating for the prior three years, efficiency test scores, two-year discipline record, twelve-month attendance record, and current work status. The spreadsheet showed that Button received a 2015 PMP rating of 100. The PMP ratings ranged from 0–120. Every Operations Supervisor with a 2015 PMP rating of less than 100 was included in the RIF except for one. As to efficiency tests, Button had the highest failure rate of all of the Operations Supervisors. In addition, Button had been disciplined twice in the two-year period. Only one other Operations Supervisor had more discipline events. He was also terminated.

The RIF spreadsheet rated each Operations Supervisor in several different work categories. The categories included "Independent Worker Understands Impact of their decisions on the Operations," "Demonstrates Strong Verbal and Written Communication Skills," and "Gets results." J.A. 1263. The spreadsheet used a rating

-3-

scale of Outstanding, Exceeds Expectations, Achieves Expectations, Partially Achieves, or Unsatisfactory. Button received a Partially Achieves rating in each of the categories. Every Operations Supervisor with a Partially Achieves rating was scheduled to be terminated in the RIF.

On February 24, 2016, the RIF team, including Marthe, Human Resources Business Partner Sheri Perkins, and several other employees, met to discuss the Operations Supervisors' experience and qualifications relative to territories that would be redistributed between the Iowa and Kansas City desks. At the time, Button had only worked at the Kansas City desk, which utilized Central Traffic Control as its communication system. The other territories used Traffic Warrant Control (TWC), which Button had little experience using, and Automatic Block Signaling (ABS), which Button had no experience using. Further, Button had no experience dispatching any territory to be added to Kansas City except for the territory from Laredo to Davenport. Marthe explained that Button would need significant training to learn ABS and TWC and to become qualified in the new territories.

Based on the spreadsheet and Button's lack of experience in the new territories and communications systems, the RIF team believed that Button was not suitable for a larger territory. At the end of the meeting, the RIF team identified six Operations Supervisors—including the two female Operations Supervisors[4]—as the least qualified Operations Supervisors and planned to terminate them in the RIF by April 1.

## C. *FMLA*

On February 5, 2016, Button notified CP that her doctor requested she take time off work for a medical issue. CP granted Button FMLA leave, and Button did

---

[4]Although the other female Operations Supervisor was scheduled to be terminated in the RIF, CP did not ultimately terminate her after several other Operations Supervisors resigned or were terminated before the scheduled RIF date. *See infra* Part I.D.

not return to work until March 4. At the time of the RIF meeting, Button was on FMLA leave, but no one present at the meeting said anything negative about her FMLA leave. The other female Operations Supervisor also took FMLA leave before the RIF meeting, but her position was ultimately not eliminated. In addition, two other Operations Supervisors took FMLA leave, but they also were not terminated in the RIF. Finally, Button had previously taken FMLA leave from February 15, 2010, to March 10, 2010, without any adverse employment action.

D. *The RIF Termination*

Before the RIF, CP terminated two of the Operations Supervisors scheduled to be terminated in the RIF for unrelated reasons. Another Operations Supervisor scheduled to be terminated resigned. And, one of the Operations Supervisors who was not scheduled to be terminated resigned and took a position elsewhere. Therefore, CP only needed to eliminate two positions to reach its restructuring goal. On March 31, 2016, Marthe and Perkins informed Button that she was being terminated as a result of the RIF. CP then eliminated the Missouri desk, and the territory realignment went into effect in April 2016.

Button filed this case, alleging that CP discriminated against her on the basis of her gender and because of her use of FMLA. CP filed a motion for summary judgment. The district court first considered Button's MHRA gender discrimination claim and found that Button had failed to show that gender was a contributing factor in her termination. The district court then found that Button failed to establish a FMLA discrimination claim because Button did not show that CP's RIF was pretext for discrimination. Consequently, the district court granted summary judgment in favor of CP. Button appeals.

## II. *Discussion*

We review the district court's grant of summary judgment de novo, granting Button "the benefit of all reasonable inferences from the evidence without resort to speculation." *Baker v. Silver Oak Senior Living Mgmt. Co.*, 581 F.3d 684, 687 (8th Cir. 2009) (quoting *Roberts v. Park Nicollet Health Servs.*, 528 F.3d 1123, 1126 (8th Cir. 2008)). "Summary judgment is appropriate if there is no genuine issue of material fact, and [CP] is entitled to judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(c)). Button raises three arguments on appeal: (1) that the district court erred in considering Marthe's and Perkins's affidavits; (2) that the district court erred in granting summary judgment to CP on Button's MHRA gender discrimination claim; and (3) that the district court erred in granting summary judgment to CP on Button's FMLA discrimination claim.

### A. *Sham Affidavit*

Button argues that the district court improperly considered two sham affidavits by Marthe and Perkins. Button acknowledges that "this case involves an atypical application of the sham-affidavit rule." Appellant's Br. at 17. Typically, sham affidavits appear as a plaintiff's stratagem to defeat summary judgment. "It is well-settled that parties to a motion for summary judgment cannot create sham issues of fact in an effort to *defeat* summary judgment." *Bass v. City of Sioux Falls*, 232 F.3d 615, 618 (8th Cir. 1999) (emphasis added) (cleaned up). In contrast, Button argues that the district court improperly considered sham affidavits from the defense in deciding to *grant* summary judgment.

The Marthe and Perkins affidavits are not shams. An affidavit is a sham affidavit if it contradicts prior testimony or is a "sudden and unexplained revision of testimony [that] creates an issue of fact where none existed before." *Id.* (internal quotation omitted). However, if the affidavit merely explains portions of a prior deposition that may have been unclear, it is not a sham affidavit. *City of St. Joseph v. Sw. Bell Tel.*, 439 F.3d 468, 476 (8th Cir. 2006).

Button bases her sham-affidavit averment on two contentions. First, she asserts that Marthe's affidavit added two factors to the RIF discussions that she never mentioned in her deposition: (1) training on communication systems and (2) knowledge of new territories. However, Marthe's deposition described how the RIF team's discussions addressed each Operations Supervisor's qualifications to dispatch the different desks alone. Those qualifications included knowledge of the different communication systems and territories. Thus, Marthe's affidavit merely expands on the discussion of Operations Supervisor qualifications. It does not contradict her deposition testimony. *See Bass*, 232 F.3d at 618 (explaining that an affidavit that expands on information not specifically asked about in a deposition is not a sham affidavit). We conclude Marthe's affidavit is not a sham.

Button also characterizes Perkins's affidavit as a sham. In her affidavit, Perkins recounted that the purpose of the RIF meeting was to gather feedback on the Operations Supervisors. Button correctly notes that Perkins's affidavit said the RIF team believed that Button could not handle the new work. She points out, however, that Perkins had previously stated in her deposition that she did not remember specifics of the RIF meeting. Button thus argues that Perkins's later, more detailed memory in the affidavit contradicts the deposition and is thus a sham. But, even if Perkins's statement could be construed as contradictory to her deposition, the district court was not obligated to disregard it. Excluding the affidavit "is limited to situations where the conflicts between the deposition and affidavit raise only sham issues." *Baker*, 581 F.3d at 690 (internal quotation omitted). Here, Perkins's testimony simply mirrored Marthe's testimony and the information listed on the spreadsheet. Perkins's affidavit raised no sham issues.

Therefore, the district court did not err in relying on Marthe's and Perkins's affidavits in its grant of summary judgment.

B. *Gender Discrimination*

Button next alleges that CP terminated her because of her gender in violation of the MHRA. The MHRA makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." Mo. Rev. Stat. § 213.055.1(1)(a). In considering Button's MHRA claim, "[w]e primarily apply Missouri law but may also apply federal employment discrimination law to the extent federal law is applicable and authoritative under the MHRA." *Heuton v. Ford Motor Co.*, 930 F.3d 1015, 1019 (8th Cir. 2019) (internal quotation omitted). "Missouri courts follow federal law so long as it is 'consistent with Missouri law.'" *Id.* (quoting *Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 818 (Mo. 2007), *abrogated on other grounds by* Mo. Rev. Stat. § 213.101.4).

Under the MHRA, Button must show "that (1) [s]he suffered an adverse employment action; (2) [her] sex was a contributing factor in that adverse action; and (3) [she] incurred damages as a direct result." *Denn v. CSL Plasma, Inc.*, 816 F.3d 1027, 1032 (8th Cir. 2016). Missouri's "'contributing factor' standard, which stems from the MHRA's prohibition of '*any* unfair treatment,' is less rigorous than the 'motivating factor' standard employed in federal discrimination cases under Title VII." *Id.* (quoting *Daugherty*, 231 S.W.3d at 819).[5] "A contributing factor has been

---

[5]The contributing factor standard "led Missouri to abandon the *McDonnell Douglas* burden-shifting analysis." *Id.* at 1032; *see also Daugherty*, 231 S.W.3d at 818–20. On August 28, 2017, a Missouri statute abrogated this less stringent standard and required courts to return to the use of the *McDonnell Douglas* burden-shifting framework. Mo. Rev. Stat. § 213.101.4. As the Missouri Supreme Court explained, "statutes are presumed to operate prospectively unless the legislature specifically provides for retroactive application of the statute or the statute is procedural." *R.M.A v. Blue Springs R-IV Sch. Dist.*, 568 S.W.3d 420, 425 n.3 (Mo. 2019). The Missouri Supreme Court has assumed that Mo. Rev. Stat. § 213.010, which now requires application of the motivating factor standard, is not retroactive. *Id.* Doing the same

defined as one that contributed a share in anything or has a part in producing the effect." *Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 867 (Mo. Ct. App. 2009) (internal quotations omitted), *overruled on other grounds by Wilson v. City of Kan. City*, 598 S.W.3d 888 (Mo. 2020).

Button may prove gender discrimination under the MHRA by presenting direct evidence of discrimination. *Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*, 444 F.3d 961, 965 (8th Cir. 2006) (citing *West v. Conopco Corp.*, 974 S.W.2d 554, 556 (Mo. Ct. App. 1998)). To be considered direct evidence of discrimination, a remark must be by a decisionmaker and "show a specific link between a discriminatory bias and the adverse employment action, sufficient to support a finding by a reasonable fact-finder that the bias motivated the action." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1045–46 (8th Cir. 2011) (en banc). Button alleges that Peterson directly discriminated against her by telling her that the Kansas City desk was no place for a woman.

Even if Peterson's statement showed discriminatory intent, it cannot be direct evidence of discrimination because Peterson was not a decisionmaker. "[S]tray remarks in the workplace, statements by nondecisionmakers, and statements by decisionmakers unrelated to the decisional process do not constitute direct evidence." *Schierhoff*, 444 F.3d at 966 (internal quotations omitted). In this case, it is undisputed that Peterson did not attend the RIF meeting or participate in any part of the decision regarding whom to terminate in the RIF. Button attempts to argue Peterson should be considered a decisionmaker because she was closely involved in the process or in a position of influence. However, in *Schierhoff*, we held that a supervisor who gathered attendance records for a termination and told the plaintiff that she was being

here, we analyze Button's claim under the "contributing factor" standard because she filed this suit on May 10, 2017. *See id.* ("The applicable statute is typically the one in effect when the petition was filed.").

-9-

terminated did not influence the plaintiff's termination and was not a decisionmaker. *Id.* The *Schierhoff* supervisor merely acted as a messenger and was not sufficiently involved in the termination. *Id.* Here, Peterson was not Button's supervisor and did not play any role in the entire RIF process. Peterson's statement is not direct evidence of discrimination.

Absent direct evidence, Button may still prove discrimination through "circumstantial evidence." *Williams*, 281 S.W.3d at 867. "Although the MHRA does not require an employee to show that an employer's stated reasons for taking adverse action were pretextual, evidence undermining the credibility of those reasons can give rise to a factual issue as to whether a discriminatory reason was a contributing factor to an employer's conduct." *Denn*, 816 F.3d at 1033. In addition, in the context of CP's RIF, Button "must make some additional showing that gender was a factor in her termination." *Hesse v. Avis Rent A Car Sys., Inc.*, 394 F.3d 624, 631 (8th Cir. 2005); *see also West*, 974 S.W.2d at 557. This could have been done with statistical evidence of preference for men or circumstantial evidence of comments and practices suggesting such a preference. *Chambers v. Metro. Prop. & Cas. Ins.*, 351 F.3d 848, 856 (8th Cir. 2003). The district court found that Button failed to present any evidence to create a genuine dispute of material fact that her gender was a contributing factor in her termination, and we agree.

To defeat the additional showing for a RIF, Button argues that CP's RIF was not a genuine RIF and, therefore, was itself a pretext for discrimination. Generally, RIF plans "include objective criteria by which to determine which jobs will be eliminated." *Bashara v. Black Hills Corp.*, 26 F.3d 820, 824 (8th Cir. 1994) (internal quotation omitted). Similar to *Bashara*, where the employer had an outlined plan to eliminate 15 positions, here, CP clearly had a plan to eliminate 6 of 16 positions and to restructure its desks. *See id.* at 824–25. Further, although a business decline may be evidence of a RIF, "[w]hen a company exercises its business judgment in deciding to reduce its work force, it need not provide evidence of financial distress to make it

a legitimate RIF." *Rahlf v. Mo-Tech Corp.*, 642 F.3d 633, 639 (8th Cir. 2011) (internal quotations omitted).

In addition, we reject Button's argument that the RIF process was too subjective. In *Rahlf*, the plaintiff similarly argued that there was no legitimate RIF because the employer did not consider the objective evidence of high performance reviews. *Id.* But, we rejected that argument because there was evidence that the employer objectively measured productivity in making its RIF decision, and we explained that a RIF does not have to be based solely on objective criteria. *Id.* Here, CP considered several objective criteria listed in its spreadsheet described above. We hold that the district court correctly concluded that CP implemented a legitimate RIF.

Even though the RIF was legitimate, Button may still show that gender was a contributing factor in her termination by presenting evidence that creates an inference of unlawful discrimination. *See Buchheit, Inc. v. Mo. Comm'n on Human Rights*, 215 S.W.3d 268, 277 (Mo. Ct. App. 2007). Button argues that even if Peterson's statement that the Kansas City desk was no place for a woman is not direct evidence of discrimination, it should still be considered indirect evidence because the statement was relevant evidence supporting an inference of gender discrimination. However, Peterson's statement "does not represent indirect evidence of discrimination because no reasonable inference links this statement to" Button's RIF termination. *Denn*, 816 F.3d at 1035 (citing *Daugherty*, 231 S.W.3d at 818) (explaining that a comment by another employee was not indirect evidence of discrimination when no one involved in the decision heard the statement). Without facts connecting the statement to the termination, "the statement does not give rise to a genuine issue of material fact regarding [Button's] discrimination claim." *Id.*

Finally, pretext may be proven, "among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010).

Button points out that "[s]ubstantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext." *Kobrin v. Univ. of Minn.*, 34 F.3d 698, 703 (8th Cir. 1994). She argues CP changed its termination rationale when Marthe's deposition added two reasons for terminating her. She contends that pointing out her lack of training in communication systems and her lack of qualification in other subdivisions constituted a shift in the reasons. She compares her case to *Kobrin*. In *Kobrin*, we found that there was a genuine dispute of material fact because the employer's reasons for not hiring the plaintiff shifted, and there was evidence that contradicted the employer's stated reasons. *Id.* In that case, the employer initially claimed to have hired another candidate because of his experience in a subject but later asserted that it did not hire the plaintiff because her experience was too focused on the same subject. *Id.*

In contrast to *Kobrin*, Marthe's reasoning did not shift but simply expanded on the previously given reasons for including Button in the RIF. Button's case more closely resembles *Loeb v. Best Buy Co.*, 537 F.3d 867 (8th Cir. 2008). There, an employer justified its termination based on the employee's changing job functions and later gave additional reasons: the employee's role was ending, and he was not qualified to perform the new work. *Id.* at 873–74. We explained that the additional reasons did not provide an inference of discrimination because they were "not a change in . . . justification for the termination but rather an elaboration." *Id.* at 874. Similarly, CP never withdrew its explanation that Button's job performance subjected her to the RIF because she was one of the weakest performers. Marthe's explanation that Button was not qualified to work the new desks simply reinforced the point that

Button was less qualified than other Operations Supervisors considered in the RIF. Marthe's elaboration did not create an inference of discrimination.[6]

Because Button failed to provide evidence giving rise to a genuine dispute of material fact as to whether CP considered her gender when deciding to terminate her in the RIF, the district court properly granted CP summary judgment on Button's MHRA gender-discrimination claim.

## C. *FMLA Discrimination*

It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" any rights under the FMLA. 29 U.S.C. § 2615(a)(1). "A discrimination claim 'arises when an employer takes adverse action against an employee because the employee exercises rights to which [s]he is entitled under the FMLA.'" *Hudson v. Tyson Fresh Meats, Inc.*, 787 F.3d 861, 866 (8th Cir. 2015) (quoting *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1006 (8th Cir. 2012)). Button alleges that the district court erred in granting summary judgment in favor of CP on Button's FMLA discrimination claim.

Button argues that CP discriminated against her because she used FMLA leave. She relies on CP's decision to terminate her in the RIF while she was on FMLA leave in February 2016. "To avoid summary judgment, [Button] must present sufficient

---

[6]Button also states that CP failed to follow its own policies, but she does not identify any policy that CP failed to follow. And, she alleges that she was similarly situated to male Operations Supervisors, but she fails to point to any particular male who was similarly situated. *See Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 994 (8th Cir. 2011) ("[T]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." (internal quotation omitted)). Button mentions that Michael Welch, another Operations Supervisor, also had a rule violation; however, he is not similarly situated because he reported to a different supervisor, and he did not require additional training.

evidence for a jury to find that [CP's] decision to terminate her was motivated by her exercise of rights under the FMLA." *Malloy v. U.S. Postal Serv.*, 756 F.3d 1088, 1090 (8th Cir. 2014). "Using FMLA leave does not give an employee any greater protection against termination for reasons unrelated to the FMLA than was available before." *Hudson*, 787 F.3d at 866 (internal quotation omitted).

Button does not offer any direct evidence that CP terminated her in the RIF for exercising her FMLA rights, so we must analyze her claim under the *McDonnell Douglas* burden-shifting framework. *Id.* at 866. To establish a prima facie case of FMLA discrimination, Button "must show that: 1) she engaged in protected conduct; 2) she suffered a materially adverse employment action; and 3) the materially adverse action was causally linked to the protected conduct." *Wierman*, 638 F.3d at 999. CP does not dispute the district court's assumption that Button established a prima facie case; therefore, "[w]e will assume without deciding that [Button] presented a prima facie case establishing a causal connection between" Button's use of FMLA leave in February 2016 and CP's decision to terminate her the same month. *Lovland v. Emp'rs Mut. Cas. Co.*, 674 F.3d 806, 813 (8th Cir. 2012). Based on the record, we agree with the district court that CP put forth a legitimate, nondiscriminatory reason for including her in the RIF—Button was one of the least qualified Operations Supervisors at the time of the RIF. *See id.*

Because CP proffered a legitimate, nondiscriminatory reason for terminating Button, to survive summary judgment she must provide evidence that creates a genuine dispute of material fact that CP's stated reason was mere pretext for FMLA discrimination. *Wierman*, 638 F.3d at 999.

> [Button] may prove pretext by demonstrating that [CP]'s proffered reason has no basis in fact, that [she] received a favorable review shortly before [s]he was terminated, that similarly situated employees who did not engage in the protected activity were treated more leniently, that

> [CP] changed its explanation for why it fired [her], or that [CP] deviated from its policies.

*Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006).

First, Button points out that she received a favorable review shortly before being terminated. This constituted a thank you letter and a gift card for completing the previous year without any incidents. A recent favorable review may be used as evidence to show that an "employer's proffered explanation for the adverse action had no basis in fact or was not actually important to the employer." *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002). However, Button's letter from CP is not evidence of pretext because it does not undermine CP's reasoning for terminating her in the RIF. She may have done well by avoiding incidents and deserved commendation, but her qualifications still compared unfavorably with other Operations Supervisors. *See id.* at 834–35 (rejecting argument that evidence of a favorable review was pretextual because the employee's high score for acknowledging gifts did not rebut the employer's separate reason for firing her after learning that she was behind on sending out receipts).

Button also attempts to point out a pattern of FMLA discrimination by CP against employees who take FMLA leave. She relies on *Hite v. Vermeer Manufacturing Co.* for support. *See* 446 F.3d 858 (8th Cir. 2006). *Hite* held that a plaintiff demonstrated a pattern of discrimination when two employees testified that they were retaliated against for taking FMLA leave. *Id.* at 868. However, *Hite* does not help. The supervisor in that case regularly complained that FMLA was bad for the company and explicitly told the plaintiff that she needed to be at work. *See Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 927 (8th Cir. 2014) (discussing *Hite*). This case contains no such evidence.

-15-

Button also fails to show that other similar CP employees had suffered FMLA discrimination. Two of the employees that Button points to never took FMLA leave. And, the other two employees were terminated for different reasons: CP terminated one of the employees two years earlier in a different RIF and fired the other for disciplinary reasons. Further, it is undisputed that CP decided to keep three Operations Supervisors considered in the RIF who had also taken FMLA leave. Button fails to point out a pattern of FMLA discrimination.

Finally, Button again argues that CP's shifting explanations and failure to follow policy are evidence of pretext. But, these arguments fail for the same reasons they did so in her gender discrimination claim—"a lack of sufficient evidence to cast doubt on [CP's] legitimate, [nondiscriminatory] reason for terminating [Button]." *See Wierman*, 638 F.3d at 1001. The record evidence does not support Button's claim CP used the RIF as pretext for FMLA discrimination. Therefore, the district court properly granted summary judgment in favor of CP on Button's FMLA discrimination claim.

## III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____