[Cite as *Pettay v. DeVry Univ., Inc.*, 2021-Ohio-1380.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Tom G. Pettay, | : | |
| Plaintiff-Appellant, | : | No. 19AP-762 |
| | | (C.P.C. No. 16CV-9365) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| DeVry University, Inc. et al., | : | |
| Defendants-Appellees. | : | |

D E C I S I O N

Rendered on April 20, 2021

**On brief**: *Law Offices of Russell A. Kelm*, *Russell A. Kelm*, and *Ian M. King*, for appellant. **Argued**: *Russell A. Kelm*.

**On brief**: *Zashin & Rich Co., L.P.A.*, and *Drew C. Piersall*; *Seyfarth Shaw LLP*, *Jennifer A. Riley* (pro hac vice), and *James C. Goodfellow* (pro hac vice), for appellees. **Argued**: *Jennifer A. Riley*.

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by plaintiff-appellant, Tom G. Pettay, from a judgment of the Franklin County Court of Common Pleas granting summary judgment in favor of defendants-appellees, DeVry University, Inc. ("DeVry"), Galen H. Graham, Marilyn K. Wiggam, and Darryl W. Field, on appellant's claim for age discrimination.

{¶ 2} DeVry is a for-profit educational institution that operates a number of campuses across the country, including one located in Columbus, Ohio. DeVry provides educational services and programs to students in areas such as business, technology and management, and offers classes both online and onsite.

{¶ 3}     Appellee Graham (individually "Graham"), an Assistant Dean of Academic Affairs at DeVry, was appellant's direct supervisor during the relevant time period, while appellee Wiggam (individually "Wiggam"), served as Dean of Academic Affairs for DeVry. Appellee Field (individually "Field") is currently an Associate Provost of Academic Operations for DeVry.

{¶ 4}     In October 1998, appellant began full-time employment as a professor with DeVry at its Columbus campus.  Appellant taught courses primarily in "business and management," but also taught "a handful of courses in engineering and information sciences."  (Appellant Depo. at 44.)  He taught classes both online and onsite.

{¶ 5}     In 2016, enrollment at DeVry was on a "downward trend."  (Appellant Depo. at 32.)  Shingai Chigwedere, DeVry's human resources consulting director, stated in his deposition that DeVry "was experiencing declining student enrollment," and was "losing money."  (Chigwedere Depo. at 18.)  Field provided deposition testimony that declining enrollment was the result of a "combination of market factors, competition and some increased regulatory changes in requirements."  (Field Depo. at 24.)

{¶ 6}     In March 2016, DeVry focused on restructuring its management positions, at which time it went from 32 regional management teams to an "eight group structure." (Field Depo. at 103.)  One of the new groups, the "[M]idwest [G]roup," included DeVry's campuses at Columbus and Nashville, Tennessee.  (Chigwedere Depo. at 44.)  Field served as the "group president" of the Midwest Group.  (Chigwedere Depo. at 44.)

{¶ 7}     In order to "offset the financial goals for fiscal year 2016," as well as revenue loss the following year, DeVry developed and implemented a reduction in force ("RIF") in 2016.  (Chigwedere Depo. at 18.)  DeVry had previously implemented RIFs in 2014 and 2015 due to declining enrollment.  The purpose of the 2016 RIF was to "align our costs to our revenue."  (Field Depo. at 77.)  According to Field, there existed "a larger number of faculty [members] per student at some geographical locations."  (Field Depo. at 78.)  DeVry sought to "uniformly align our faculty size to the student population consistently across the country."  (Field Depo. at 78.)

{¶ 8}     DeVry formed an executive committee to implement the 2016 RIF, which involved a total of three RIFs that year.  In March 2016, DeVry conducted a RIF involving non-academic personnel at which time the eight-group model was implemented and Field

became group president of the Midwest Group.  DeVry conducted a second RIF in May 2016.  Later that year, a meeting was held to discuss "faculty restructure" and a "faculty reduction."  (Field Depo. at 28.) DeVry estimated that approximately 140 faculty members would be impacted under the RIF.  Field was informed there would be a "ranking and selection system created that would help identify the impacted faculty."  (Field Depo. at 30-31.)

{¶ 9}    In its summary judgment decision, the trial court noted deposition testimony that DeVry utilized "a mathematical formula to determine which professors would be retained."  (Decision at 1.)  The formula "included consideration of whether professors had a doctorate in their field or were currently pursuing the same, their course evaluation scores, their performance ratings for the two previous fiscal years, whether they taught courses both online and onsite, and whether fewer than fifty percent of the professor's respective courses were being eliminated."  (Decision at 1.)  There were "some deviations" from the mathematical formula, including consideration whether a professor was currently serving as a faculty chair, whether the loss of a particular professor could impact the school's accreditation process, or if the removal of a professor would leave a campus without a full-time professor.  (Decision at 1.)

{¶ 10} Following approval of the RIF for faculty members, DeVry "had an initial selection at the end of April of 2016 using [the] selection criteria."  (Chigwedere Depo. at 43.)  At that time, "a list was generated of the number of faculty that would be impacted." (Chigwedere Depo. at 43.)  The RIF involving full-time professors was planned for July 2016, but it was determined that faculty members would not be notified until approximately "mid-June" to minimize "possible classroom disruption."  (Chigwedere Depo. at 43.)  Appellant was not part of the initial list generated for inclusion in the RIF.

{¶ 11} On June 7, 2016, the executive committee "made the determination that [DeVry] needed to cut additional faculty head count in three specific groups," including the Midwest Group.  (Chigwedere Depo. at 44.)  John Dunbar, the Group Dean, notified the three group presidents of the "need to make additional faculty head counts" in each of the groups.  (Chigwedere Depo. at 44.)  Field initially recommended five individuals for inclusion in the RIF, including appellant.  Field recommended appellant because he did not

have a doctorate, his retention was not needed for "accreditation purposes," and business courses at Columbus were "under enrolled." (Chigwedere Depo. at 44-45.)

{¶ 12} With respect to the Columbus campus, the school's academic excellence department was responsible for identifying potential RIF candidates. The department was headed by Wiggam, who reported to Field. Wiggam and Field were asked to "provide feedback on the names of the individuals that were on the impacted list." (Field Depo. at 36.) Such feedback "didn't necessarily mean the person's name came off of the list." (Field Depo. at 37.) Field stated that additional selections for inclusion in the RIF were made using "the exact same spreadsheet and criteria that was used for the initial list." (Field Depo. at 51.)

{¶ 13} Wiggam testified that she reviewed the list with Field and they discussed "the business needs and the tiebreakers and reasons that we should retain or hopefully be able to retain professors." (Wiggam Depo. at 45.) Wiggam was questioned about discussions involving appellant and his inclusion in the RIF, and she cited the fact he taught "in the College of Business Management, which had declining enrollment," he "was teaching classes that could be taught by other full-time professors," and his inclusion in the RIF did not affect the school's accreditation process. (Wiggam Depo. at 45.) Wiggam, Field, and Chigwedere all testified that age was never discussed during the RIF process.

{¶ 14} Appellant's position with DeVry was terminated effective July 9, 2016. On September 30, 2016, appellant filed a complaint against appellees alleging a claim for age discrimination in violation of R.C. 4112.02 and 4112.99. In the complaint, appellant alleged that DeVry's 2016 RIF, which resulted in the elimination of his position as a full-time professor, had a disparate impact on employees at DeVry over the age of 40. It was further alleged that 94 percent of those employees terminated in the July 2016 RIF, which included full-time professors, were over the age of 40.

{¶ 15} On January 12, 2018, appellees filed a motion for summary judgment. In support of the motion, appellees submitted the deposition testimonies of Field, Wiggam, Chigwedere, appellant, and appellant's statistical expert, William Notz, Ph.D. On June 25, 2018, appellant filed a memorandum in opposition to the motion for summary judgment asserting that statistical evidence regarding the RIF established a prima facie case of discrimination, and that there existed genuine issues of material fact whether appellees'

proffered reasons for appellant's termination were a pretext for discrimination. Appellees subsequently filed a reply. On October 7, 2019, the trial court filed a decision and entry granting appellees' motion for summary judgment.

{¶ 16} On appeal, appellant sets forth the following two assignments of error for this court's review:

> [I.] THE TRIAL COURT ERRED IN CONCLUDING PLAINTIFF FAILED TO PROVE THE FOURTH PRONG OF HIS PRIMA FACIE CASE WHEN HE WAS TREATED LESS FAVORABLY THAN SUBSTANTIALLY YOUNGER INDIVIDUALS.
>
> [II.] THE TRIAL COURT ERRED IN FAILING TO CONSIDER THAT THE REDUCTION IN FORCE IN WHICH PLAINTIFF WAS TERMINATED WAS ADMINISTERED IN A MANNER WHICH WAS A PRETEXT FOR AGE DISCRIMINATION.

{¶ 17} Appellant's assignments of error are interrelated and will be considered together. Under these assignments of error, appellant challenges the trial court's grant of summary judgment in favor of appellees, asserting the trial court erred in: (1) concluding he failed to prove the fourth prong of his prima facie case, and (2) in failing to consider that the manner in which appellees conducted the RIF was a pretext for age discrimination.

{¶ 18} This court's review of a trial court's decision granting summary judgment is "de novo." *Dautartas v. Abbott Labs.*, 10th Dist. No. 11AP-706, 2012-Ohio-1709, ¶ 20, citing *Andersen v. Highland House Co.*, 93 Ohio St.3d 547, 548 (2001). Under Civ.R. 56(C), summary judgment is appropriate when the moving party demonstrates: "(1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence most strongly construed in that party's favor." *Id.* at ¶ 21, citing Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997).

{¶ 19} R.C. 4112.02(A) states in part: "It shall be an unlawful discriminatory practice * * * [f]or any employer, because of the * * * age * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect

to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

{¶ 20} Under Ohio law, "[i]n order to prevail in an employment discrimination case, the plaintiff must prove discriminatory intent." *Mauzy v. Kelly Servs., Inc.*, 75 Ohio St.3d 578, 583 (1996). A plaintiff may establish such intent "with either direct or indirect methods of proof." *Morrissette v. DFS Servs., LLC*, 10th Dist. No. 10AP-633, 2011-Ohio-2369, ¶ 12. In a direct method of proof case, " '[a] plaintiff may establish a prima facie case by presenting evidence, of any nature, to show that an employer more likely than not was motivated by discriminatory intent.' " *Smith v. E.G. Baldwin & Assocs., Inc.*, 119 Ohio App.3d 410, 415 (10th Dist.1997), quoting *Byrnes v. LCI Communication Holdings Co.*, 77 Ohio St.3d 125, 128-29 (1996), citing *Mauzy* at paragraph one of the syllabus.

{¶ 21} In evaluating discrimination cases based on indirect evidence, Ohio courts have adopted the analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which " 'involves a three-step procedure that allocates the shifting burdens of production of evidence on the parties.' " *Kundtz v. AT&T Solutions, Inc.*, 10th Dist. No. 05AP-1045, 2007-Ohio-1462, ¶ 17, quoting *Wang v. Goodyear Tire & Rubber Co.*, 68 Ohio App.3d 13, 16 (9th Dist.1990). Under this framework, "the employee must first 'establish a prima facie case of age discrimination. Next, the burden of production shifts to the employer to state some legitimate non-discriminatory reasons for the employee's discharge. Finally, the burden shifts back to the employee to show that the employer's stated reasons were a pretext for age discrimination.' " *Id.*, quoting *Wang* at 16.

{¶ 22} A prima facie case of employment discrimination may be established by proof that the plaintiff-employee: "(1) was a member of the statutorily protected class, (2) was discharged, (3) was qualified for the position, and (4) was replaced by, or the discharge permitted the retention of, a person of substantially younger age." *Coryell v. Bank One Trust Co. N.A.,* 101 Ohio St.3d 175, 2004-Ohio-723, ¶ 20.

{¶ 23} Ohio courts, "including this court, have held that a RIF 'necessarily requires modification of the indirect method of proof and establishing a prima facie case by modifying the fourth element under * * * *McDonnell Douglas*.' " *Kundtz* at ¶ 21, quoting *Dahl v. Battelle Mem. Inst.*, 10th Dist. No. 03AP-1028, 2004-Ohio-3884, ¶ 15. Accordingly, "in cases of a termination due to a RIF, 'an age discrimination plaintiff carries a greater

burden of supporting allegations of discrimination by coming forward with additional evidence, be it direct, circumstantial, or statistical, to establish that age was a factor in the termination.' " *Id.* The purpose of requiring the plaintiff to introduce additional evidence in RIF cases "is to ensure 'there is a chance that the work force reduction is not the reason for the termination.' " *Mittler v. OhioHealth Corp.*, 10th Dist. No. 12AP-119, 2013-Ohio-1634, ¶ 33, quoting *Woods v. Capital Univ.*, 10th Dist. No. 09AP-166, 2009-Ohio-5672, ¶ 57, citing *Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006); *Lovas v. Huntington Natl. Bank*, 215 F.3d 1326 (6th Cir.2000), fn. 1 (Table).

{¶ 24} With respect to the issue of evidence of discriminatory intent under the direct method of proof, appellant relies on statistical evidence in asserting age had to be a factor in the decision to eliminate his position. We note that appellant, in addressing the direct method of proof, points to no evidence of age-related remarks, nor does the record suggest appellant's age was ever discussed by decisionmakers during the RIF. As noted under the facts, Wiggam, Field, and Chigwedere all testified that age was never considered as a factor in the RIF process. When asked why he thought age was the reason for his termination, appellant responded: "I feel that I had a pretty high utility there, a pretty high value." (Appellant Depo. at 54.)

{¶ 25} For purposes of analyzing the four elements of the prima facie case, the trial court noted it was the "heightened fourth element * * * that is at issue" in appellant's discrimination claim. (Decision at 4.) In reviewing a line of cases from this court addressing the use of statistics in discrimination cases, the trial court found the statistical evidence relied on by appellant through his expert, Dr. Notz, was insufficient to raise a genuine issue of material fact.

{¶ 26} As observed by the trial court, this court has had several occasions to consider the use of statistics in discrimination cases. In a 1999 decision, *Swiggum v. Ameritech Corp.*, 10th Dist. No. 98AP-1031 (Sept. 30, 1999), this court considered the use of statistical evidence in an age discrimination claim. Under the facts of that case, the plaintiff introduced an exhibit indicating that 96 percent of the employees terminated during a company-wide RIF were over the age of 40. While recognizing statistical evidence may prove discrimination, we found the statistical evidence presented by the plaintiff in that case, which "sought to raise an inference of discrimination merely from that fact that * * *

a greater number of older employees were selected" for termination, was "flawed" and lacking in probative value. *Id.* Specifically, we found the statistical evidence insufficient to support a prima facie case of discrimination because it "failed to take into consideration any independent variables that might explain the association between age and termination rates, including job skills, education, experience, performance or self-selection." *Id.* In a subsequent decision, *Dahl*, this court, relying in part on *Swiggum,* held that statistical evidence, in order to be of probative value, must "account for variations among employees" with respect to variables such as "skill level, job function, and education." *Dahl* at ¶ 18.

{¶ 27} The reasoning employed in *Swiggum* and *Dahl* was followed by this court in *Boggs v. Scotts Co.*, 10th Dist. No. 04AP-425, 2005-Ohio-1264, a case involving a company-wide RIF designed to cut costs during an economic downturn. In *Boggs*, this court relied on our prior decisions in recognizing that "unelaborated statistics that fail to consider independent variables such as job skills, education, experience, performance or self-selection, were insufficient to establish a material issue of fact" for purposes of summary judgment. *Id.* at ¶ 16. Under the facts in *Boggs*, we found the appellant's statistical evidence, which looked only at "the number of persons above and below the age of 40 who were selected for termination," and which failed to consider other non-discriminatory business reasons, was not probative of whether the employer decided to terminate her based solely on age. *Id.* at ¶ 18.

{¶ 28} Subsequent decisions of this court have remained consistent with *Swiggum, Dahl*, and *Boggs. See*, *e.g.*, *Mittler* at ¶ 34 (evidence consisting of "unelaborated statistics," as a matter of law, did "not demonstrate a chance that the workforce reduction was not the reason for her termination"); *Jelinek v. Abbott Labs.,* 10th Dist. No. 17AP-576, 2019-Ohio-3860, ¶ 38, quoting *Boggs* at ¶ 16 (adhering to "this court's precedent that 'unelaborated statistics that fail to consider independent variables' are not probative of discrimination"); *Roty v. Battelle Mem. Inst.*, 10th Dist. No. 18AP-956, 2020-Ohio-4389, ¶ 24 (noting "[w]e have affirmed the need for independent factor assessment several times since *Swiggum*, and recently, and we discern no persuasive reason to depart from the well established analytical framework").

{¶ 29} In applying this court's line of cases to the facts of the instant case, the trial court noted that appellant's expert, Dr. Notz, "testified that he took the information

provided by Plaintiff's counsel, which included the number and age of professors included in the RIF, and calculated the percentage of professors over forty and under forty that were included and not included in the RIF." (Decision at 4.) The trial court further observed that the "only variable considered by Notz in his analysis is age." (Decision at 4.) Citing evidence that DeVry "considered at least five separate variables not related to age when it decided who to select for the RIF," the court deemed significant the fact Dr. Notz "did not consider any of the variables articulated by DeVry, or any variable other than age, in providing his expert opinion." (Decision at 5.)

{¶ 30} A review of the record, including the exhibits and deposition testimony of Dr. Notz, supports the trial court's finding that appellant's statistical analysis is limited to a consideration of over-40 and under-40 employees "included and not included" in the RIF. (Decision at 4.) Based on that analysis, Dr. Notz opined in his deposition that the distribution in age reflected in the statistics "would be considered highly unusual" if the process for selecting individuals for the RIF was random. (Dr. Notz Depo. at 29.)

{¶ 31} Dr. Notz acknowledged, however, he was unaware of the criteria utilized to select RIF candidates, nor was he even aware of the position appellant held at DeVry. Dr. Notz further acknowledged he could not say "from these numbers" whether age was a factor or part of the decision-making process in determining who was selected. (Dr. Notz Depo. at 48.) When asked to assume that multiple factors were considered in the RIF selection process, Dr. Notz stated he would need to perform further statistical analysis to determine which factor/factors might lead to a correlation to age. Dr. Notz agreed that, in order to "sort out which of the factors was most highly correlated with age * * * I would need to see that additional information, because all I have is the aggregate, obviously." (Dr. Notz Depo. at 51.) Dr. Notz further stated he would "need the numbers broken down by the different factors." (Dr. Notz Depo. at 55.)

{¶ 32} The record also indicates the statistical analysis is based on a consideration of all positions eliminated by the RIF during the three phases in March, May, and July 2016, i.e., it groups together not only full-time professors but non-professor positions. However, as noted by appellees, the evidence on summary judgment indicates the selection criteria for the July 2016 RIF involving full-time professors was different from the criteria used to reduce positions for DeVry employees in March and May 2016.

{¶ 33} More significantly, and as noted above, the statistical evidence and analysis offered by appellant through his expert is based solely on a consideration of the number of individuals over the age of 40 and those below the age of 40 affected by the RIF (i.e., the statistical evidence, based only on the variables of age and termination, fails to take into consideration any other independent variables or factors). As such, the analysis by Dr. Notz was based on the type of raw statistics this court has found, standing alone, insufficient to establish a prima facie case of discriminatory intent.

{¶ 34} We note that several of this court's prior decisions have, in fact, involved the same expert and the same type of statistical evidence and analysis. *See*, *e.g.*, *Roty* at ¶ 18 (finding trial court "properly cited *Boggs* * * * which upheld a trial court's determination that statistical evidence propounded by Professor Notz in that RIF case was not probative of discriminatory intent because 'Notz's affidavit indicates that he only looked at the number of persons above and below the age 40 who were selected for termination' " and failed to take into consideration other factors); *Jelinek* at ¶ 35 (affirming trial court's determination that raw statistics presented by plaintiff and analyzed by same expert, Dr. Notz, were of no probative value as the expert's analysis "only looked at the ages of the individuals terminated").

{¶ 35} Appellant argues this case is distinguishable from our past cases involving the use of statistics because appellees interjected subjective criteria into the RIF process. More specifically, appellant contends there is evidence appellees considered "each employee * * * on an individual basis," and further maintains appellees "admit they didn't even use the alleged mathematical formula in selecting employees for termination." (Appellant's Brief at 18.) In support, appellant points to deposition testimony of Field stating he was asked to provide recommendations as to which individuals should or should not be considered for inclusion on the list for impact.

{¶ 36} In response, appellees argue appellant mischaracterizes the testimony of Field regarding his role in appellant's selection for inclusion in the RIF. According to appellees, while Field provided input and made recommendations, the record indicates appellant was selected through the mathematical formula and other business-related criteria, and that Field himself confirmed his suggestions were rejected in favor of the rote application of the selection criteria.

{¶ 37} The record indicates the primary evidence regarding the RIF selection process was provided through the deposition testimony of Chigwedere, Field, and Wiggam. During his deposition, Chigwedere identified an exhibit (Depo. Ex. No. 2) as "a presentation that our provost and our team" utilized to "walk through the faculty selection in connection with the reduction in force." (Chigwedere Depo. at 33.)

{¶ 38} The document contains three headings listing "Criteria," "Definition" and "Weighting," and summarizes the criteria (and weighting) in part as follows: (1) "Credentials" (i.e., having a doctorate or enrolled in a doctorate program) (20%); (2) "ECE scores" (i.e., end of course evaluation scores of "3.5+") (25%); (3) "Performance Ratings" (35%); (4) "Modalities" (i.e., taught "online and onsite") (10%); and (5) "Taught in 186 courses" (i.e., taught "less than 50% in the 186 courses being eliminated") (10%). The exhibit also listed the following three "Filters/Tie breakers": (1) "Faculty Chair" (identified as "already engaged colleagues" who will "make good mentors to VPs"; (2) "Performance"; and (3) "College Designation" (i.e., to "ensure we have coverage at appropriate locations per ACBSP, ABET and state requirements"). (Depo. Ex. No. 2 at 2.)

{¶ 39} Chigwedere testified there was "an initial selection at the end of April of 2016" using the selection criteria in deposition exhibit No. 2. (Chigwedere Depo. at 43.) He stated that "a list was generated of the number of faculty that would be impacted at that point in time." (Chigwedere Depo. at 43.) DeVry initially anticipated that 140 faculty members would be impacted by the RIF. In June, however, it was determined "that we needed to cut additional faculty head count in three specific groups," including "the midwest group, which included Columbus and Nashville." (Chigwedere Depo. at 44.)

{¶ 40} During a call on June 7, 2016 in which John Dunbar spoke with the three group presidents, Field initially recommended five individuals, including appellant, for consideration. Field recommended appellant for consideration based on the fact he did not have a doctorate degree, "we didn't need to necessarily retain him for accreditation purposes," and because courses at the Columbus campus were "under enrolled." (Chigwedere Depo. at 44-45.)

{¶ 41} During a meeting on June 10, 2016, Dunbar, Field, and Wiggam "walked through the spreadsheet person by person to have discussions about the selection criteria and to hear * * * Field's and * * * Wiggam's concerns about some of the folks being impacted

that were above Mr. Pettay using the mathematical selection scores themselves." (Chigwedere Depo. at 46.)  As part of that discussion, "they walked through each of the colleagues and using the selection criteria talked through any filters or tie breakers that applied" to those individuals for potential retention.  (Chigwedere Depo. at 46.)

{¶ 42}  Chigwedere noted some individuals were retained under the filter/tiebreaker criteria in order to maintain the schools accreditation status or to ensure at least one full-time faculty member remained at a location.  During his deposition, Chigwedere was questioned about specific individuals retained whose names were initially above appellant on the list. He noted that one of the named individuals "was kept for accreditation" purposes, while another was "needed to retain a full-time faculty member in Cleveland." (Chigwedere Depo. at 51.)  Chigwedere identified four other individuals who "were needed for retention for college designation in the faculty filter tie breaker."  (Chigwedere Depo. at 52.)  With respect to individuals tied with appellant, Chigwedere stated "we used the selection criteria to apply that in the selection process."  (Chigwedere Depo. at 54.)

{¶ 43}  Field provided deposition testimony that DeVry, after assessing the initial list of faculty professor impacts, determined additional reductions were necessary. Specifically, in considering "faculty ratio to student population across the system * * * we identified * * * several locations, including Columbus, where there seemed to be a larger number of faculty in comparison to the number of students."  (Field Depo. at 136.)   As a result, although there were 26 individuals "in the initial list that would have been protected, * * * as we expanded the list, they were now included in the impact list."  (Field Depo. at 137.)  With respect to the Midwest Group, it was determined that at least four positions at the Columbus campus (where appellant worked) would be further impacted.

{¶ 44}  After the rankings were presented, managers "were asked to * * * provide feedback on the names of the individuals that were on the impacted list."  (Field Depo. at 36.)  Field stated "[w]e were invited to provide that feedback," but it "didn't necessarily mean the person's name came off of the list."  (Field Depo. at 37.)  He further stated: "I simply provided feedback[.]  I wasn't part of the decision-making."  (Field Depo. at 73.)

{¶ 45}  During his deposition, Field was questioned as to "the criteria in which you based a request to take someone off the list that would otherwise be included."  (Field Depo. at 37.)   Field stated the criteria "included being a faculty chair, teaching in an area that was

needed for an aspect of reaccreditation for a program," as well as consideration whether the removal of an individual from a particular campus location would leave the school "without a full-time faculty member." (Field Depo. at 37.) When asked how the selections were made "to include additional people," Field responded: "They used the exact same spreadsheet and criteria that was used for the initial list." (Field Depo. at 51.) He further stated: "The only thing I understand is that we used the specific criteria that were on the spreadsheet to do the ranking of the faculty. At no point in time [were] there conversations about age or using anything besides the criteria that was on the spreadsheet as a way to rank the faculty." (Field Depo. at 76.)

{¶ 46} Wiggam was also questioned during her deposition as to recommendations she made to retain individuals on the list potentially subject to impact, and she similarly testified that her recommendations involved a consideration of whether the particular individual served as a faculty chair, whether the individual was needed for upcoming accreditation, or whether the removal of a faculty member would leave a campus or a program without a full-time professor. Wiggam stated her role involved "looking at the individuals on the list to try to determine the business needs and any tiebreakers." (Wiggam Depo. at 31.) She testified that "age was never discussed" as part of the RIF process. (Wiggam Depo. at 29.) Regarding discussions as to appellant's inclusion in the RIF, Wiggam recalled that he worked "in the College of Business Management, which had declining enrollment," he "was teaching classes that could be taught by other full-time professors," and his position did not impact accreditation. (Wiggam Depo. at 45.)

{¶ 47} Contrary to appellant's contention, the record does not support his claim that DeVry "did not use the alleged 'independent' criteria," or that it made substantial deviations from the criteria such that the mathematical formula bore no relationship to the actual selection process. (Appellant's Brief at 24.) Further, while appellant asserts that Field "selected" individuals for termination based on his own "subjective" criteria, the record indicates, as argued by appellees, that DeVry did not rely on Field's recommendations in lieu of application of the criteria. By way of example, appellant points to deposition testimony by Field in which he was asked why he recommended one (named) professor over another (named professor) to remain at the Nashville campus. While Field responded that he thought the students at that campus "would be best served" by retaining the former

individual, the record indicates that neither of those professors were ultimately selected for termination. (Field Depo. at 156.)

{¶ 48} On review, the "unelaborated statistics" offered by appellant are, based on our prior precedent, "insufficient to establish a material issue of fact either under the direct method of proving discrimination or a prima facie case in the indirect method because they 'failed to take into consideration any independent variables that might explain the association between age and termination rates, including job skills, education, experience, performance or self-selection.' " *Dahl* at ¶ 18, quoting *Swiggum*. Accordingly, we agree with the trial court's determination that the statistical evidence and analysis was not probative of whether appellees intentionally discriminated against appellant on the basis of age. Because appellant has not shown, through statistical evidence or other direct or indirect evidence that he was chosen for inclusion in the RIF due to his age, we further agree with the trial court that appellant failed to establish a prima facie case of age discrimination.

{¶ 49} Even if appellant had established a prima facie case of age discrimination, appellees offered a legitimate non-discriminatory reason for appellant's termination, i.e., the business necessity for the RIF due to declining enrollment at the campuses and the need to preserve revenue. Appellees also submitted evidence that it utilized pre-defined selection criteria, including mathematical rankings and other business-related factors, in implementing the RIF.

{¶ 50} Appellant, in order to survive summary judgment, "was required to establish that the reasons offered by [appellees] for his inclusion in the reduction in force were untrue and merely a pretext for age discrimination." *Southworth v. N. Trust Secs., Inc.*, 195 Ohio App.3d 357, 2011-Ohio-3467, ¶ 36 (8th Dist.), citing *Chandler v. Dunn Hardware, Inc.*, 168 Ohio App.3d 496, 2006-Ohio-4376, ¶ 9 (8th Dist.). Specifically, appellant's "burden is to prove that the employer's reason was false and that discrimination was the real reason for the employer's actions." *Frick v. Potash Corp. of Saskatchewan, Inc.*, 3d Dist. No. 1-09-59, 2010-Ohio-4292, ¶ 21. In order to refute an employer's "legitimate, non-discriminatory reason offered to justify an adverse employment action, a plaintiff is required to show either that the proffered reason: (1) has no basis in fact; (2) did not actually motivate the defendant's challenged conduct; or (3) was insufficient to warrant the

challenged conduct." *Kundtz* at ¶ 32, citing *Hoffman v. CHSHO, Inc.*, 12th Dist. No. CA2004-09-072, 2005-Ohio-3909, ¶ 26.

{¶ 51} Appellant contends he met his burden of establishing pretext by presenting evidence that Field and Wiggam deviated from the criteria in making recommendations. Appellant also questions the criteria used as "rife with pretext," and further maintains the selection process and criteria permitted bias and subjectivity. (Appellant's Brief at 32.)

{¶ 52} In addressing the prima facie case, we have previously considered and found unpersuasive appellant's claim of evidence that Field and Wiggam ignored the objective criteria in making recommendations, or that DeVry made the decision to terminate appellant based on Field's recommendation and/or subjective criteria. Further, even accepting the argument that the RIF selection process itself involved some subjectivity, we note that federal courts addressing this issue have rejected arguments that a RIF must be based "solely on objective criteria." *Button v. Dakota, Minn. & E. R.R. Corp.*, 963 F.3d 824, 833 (8th Cir.2020). *See, e.g.*, *Beck v. Buckeye Pipeline Servs. Co.,* 501 Fed.Appx. 447, 451 (6th Cir.2012) ("the use of subjective evaluation criteria does not by itself show discrimination, particularly in a reduction in force case"); *Gilster v. Humana, Inc.*, S.D.Ohio No. 1:14-CV-961 (Jan. 19, 2016) ("The employer's use of subjective evaluation criteria does not establish pretext, particularly in a reduction-in-force case, where the plaintiff must prove that age, and not the reduction-in-force, was the real reason for his termination.").

{¶ 53} This court has previously observed that, in order to discredit an employer's proffered reason, "a plaintiff cannot simply show that the employer's decision was wrong or mistaken, 'since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.' " *Kundtz* at ¶ 37, quoting *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir.1994). The issue, rather, " 'is whether the subjective criteria were used to disguise discriminatory action.' " *Beck* at 450, quoting *Grano v. Dept. of Dev. of Columbus*, 699 F.2d 836, 837 (6th Cir.1983). Accordingly, even in instances where an employer's assessment includes "subjective elements, there must still be a showing that 'this subjectivity was used as a pretext for discrimination.' " *Kundtz* at ¶ 38, quoting *Brown v. EG&G Mound Applied Technologies, Inc.*, 117 F.Supp.2d 671, 680 (2000).

{¶ 54} As noted, appellees articulated a legitimate, non-discriminatory reason for appellant's termination, i.e., the necessity of implementing a RIF due to economic factors, and the use of pre-defined criteria to rank and select full-time professors for inclusion in the RIF. The evidence indicates DeVry utilized the mathematical formula, as well as other business-related criteria for filters/tiebreakers, in selecting professors for the RIF. In their depositions, Chigwedere, Field, and Wiggam testified that appellant's position was vulnerable because he did not have a doctorate, he worked on campus (Columbus) that was under-enrolled, and his inclusion in the RIF would not affect the school's accreditation, i.e., objective factors. Further, the uncontroverted testimony of these deposition witnesses was that age was never discussed nor considered as part of the RIF review/ranking process. *See Freshour v. TK Constructors, Inc.*, 10th Dist. No. 10AP-28, 2011-Ohio-2163, ¶ 30 (affirming trial court's grant of summary judgment in age discrimination claim and noting that "[a]ccording to the affidavits and deposition testimony, age was never even discussed during the reduction in force decision-making process").

{¶ 55} To the extent DeVry may have "relied upon both objective and subjective criteria in rating and ranking" full-time professors for the RIF, a reviewing court "does not sit as a 'super-personnel department' and it will not second-guess the business practices of employers." *Suslovic v. Black & Decker, Inc.*, N.D.Ohio No. 1:06CV116 (July 23, 2007), quoting *Meacham v. Knolls Atomic Power Laboratory*, 461 F.3d 134, 141 (2d Cir. 2006). While appellant may disagree with the criteria and his ultimate ranking, the evidence does not create a genuine issue of material fact whether appellees were motivated by discriminatory animus or that they employed subjective factors as a pretext for age discrimination.

{¶ 56} We have also discussed the statistical evidence presented by appellant in addressing the prima facie case. Here, the raw statistics submitted by appellant are insufficient to refute appellees' non-discriminatory explanation for the RIF and appellant's ultimate termination under the RIF.

{¶ 57} Based on this court's de novo review, the trial court did not err in finding appellant failed to establish a prima facie case of age discrimination. Further, even if appellant had established a prima face case, the evidence presented by appellant was insufficient to raise a genuine issue of material fact as to whether appellees' stated non-

discriminatory reasons for the RIF and for appellant's termination were false and, instead, a pretext for an age-based decision.

{¶ 58} In light of the foregoing, appellant's two assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas granting summary judgment in favor of appellees is affirmed.

*Judgment affirmed.*

LUPER SCHUSTER and BEATTY BLUNT, JJ., concur.

_____