[Cite as *Southworth v. N. Trust Securities, Inc.*, 195 Ohio App.3d 357, 2011-Ohio-3467.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 95763**

## SOUTHWORTH,

APPELLANT,

v.

## NORTHERN TRUST SECURITIES, INC., ET AL.,

APPELLEES.

### JUDGMENT:
### REVERSED AND REMANDED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-688175

**BEFORE:** STEWART, P.J., S. GALLAGHER, J., and ROCCO, J.

**RELEASED AND JOURNALIZED:** July 14, 2011

Haber Polk Kabat, L.L.P., Shannon J. Polk, and Daniel M. Connell, for appellant.

Benesch, Friedlander, Coplan & Aronoff, L.L.P., Peter N. Kirsanow. Jeremy Gilman, and Patrick O. Peters, for appellees.

MELODY J. STEWART, Presiding Judge.

{¶ 1}  Plaintiff-appellant, John D. Southworth, appeals from a summary judgment rendered on his age-discrimination claim against his former employer, defendant-appellee, Northern Trust Securities, Inc.  Northern Trust terminated Southworth, a 63-year-old portfolio manager, during a reduction in force ("rif") resulting from the meltdown of financial markets at the end of 2008.  Northern Trust claimed to have made the termination decision by means of objective ranking of the portfolio managers, but Southworth maintained that the ranking was a pretext for age discrimination because the decision to terminate him not only predated the ranking but Northern Trust fabricated or otherwise manipulated these results in order to justify its retention of a younger, less-productive employee.  The court found no direct evidence of discrimination and further found that Southworth failed to make out a prima facie case of discrimination.

I

{¶ 2}  Southworth brought his age-discrimination claim under R.C. 4112.02(A), which makes it an unlawful discriminatory practice for any employer to discharge an employee without just cause because of age.  To the extent that the rights set forth in R.C. Chapter 4112 are similar to those expressed in Title VII of the Civil Rights Act of 1964, Section 2000 et seq., Title 42, U.S.Code, we can apply federal precedent in interpreting R.C.

Chapter 4112.  See *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.* (1981), 66 Ohio St.2d 192, 196, 421 N.E.2d 128.

{¶ 3}  Age-discrimination claims can be proven in one of two ways:  with direct evidence of discrimination or by establishing a prima facie case of discrimination.  See *Olive v. Columbia/HCA Healthcare Corp.* (Mar. 9, 2000), 8th Dist. Nos. 75249 and 76349.  Southworth offered evidence of both in opposition to summary judgment, and we consider that evidence in turn, under the Civ.R. 56(C) standard that we review contested facts in a light most favorable to Southworth.

II

{¶ 4}  To make a noncircumstantial case under the direct method of proof, Southworth had to present evidence that, if believed by a jury, would prove that Northern Trust acted with discriminatory intent; that is, it made an admission or "near admission" that its decision to terminate Southworth was discriminatory.  See *Nagle v. Calumet Park* (C.A.7, 2009), 554 F.3d 1106, 1114.  Direct evidence of discriminatory intent requires more than just conjecture—it should be evidence that can be interpreted as an acknowledgment of discriminatory intent by Northern Trust or its supervisors.  *Hill v. Burrell Communications Group* (C.A.7, 1995), 67 F.3d 665, 667.  Under this standard, "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age will constitute direct evidence of discrimination."  *Damon v. Fleming Supermarkets of Florida, Inc.* (C.A.11, 1999), 196 F.3d 1354, 1359, quoting *Earley v. Champion Internatl. Corp.* (C.A.11,

1990), 907 F.2d 1077, 1081-1082.  See also *Febres v. Challenger Carib. Corp.* (C.A.1, 2000), 214 F.3d 57, 60-61 (direct evidence consists of "statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision").

A

{¶ 5}  Southworth's direct evidence of age discrimination consisted of remarks made by his supervisors that he was "old school" and "stuck in his ways."

{¶ 6}  Direct evidence does not include stray remarks in the workplace, statements by non-decision-makers, or statements by decision-makers unrelated to the decisional process itself.  *Twymon v.Wells Fargo & Co.* (C.A.8, 2006), 462 F.3d 925, 933.  In *Rubinstein v. Admrs. of Tulane Edn. Fund* (C.A.5, 2000), 218 F.3d 392, 400-401, the court explained that comments are evidence of discrimination only if they are " '1) related [to the protected class of persons of which the plaintiff is a member]; 2) proximate in time to the [complained-of adverse employment decision]; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue."  (Citation omitted.) See also *Cooley v. Carmike Cinemas, Inc*. (C.A.6, 1994), 25 F.3d 1325, 1330.

{¶ 7} The remarks at issue were made in early to mid 2007 by Southworth's immediate supervisor in a conversation the supervisor had with another employee.  The employee who heard the remarks said that they arose in a conversation concerning the supervisor's directive that no new business coming into the office should be assigned to Southworth.  In her deposition, the employee said that Southworth's supervisor told her that

4

"Jack was not going to be cutting edge or innovative or something of that nature, and was old school in his approach."

{¶ 8} The actual statements made by the supervisor were unclear—the employee who heard the remarks conceded both in her deposition and affidavit that she could not recall whether the supervisor used the specific phrases "too set in his ways" and "old school." She could only claim that the supervisor used "words to that effect." For purposes of summary judgment, however, we must view the evidence in a light most favorable to Southworth and assume that Southworth's supervisor made the remarks as alleged. See Civ.R. 56(C).

{¶ 9} We need not consider whether the remarks were ageist, because we find as a matter of law that the remarks were too remote in time to support the conclusion that Southworth's supervisor made them with the intent to discriminate. Isolated ageist comments are insufficient to establish pretext unless they "can somehow be tied to the employment actions disputed in the case at hand." *Stewart v. Adolph Coors Co.* (C.A.10, 2000), 217 F.3d 1285, 1289. Put differently, the term "direct evidence" normally contemplates only those "'statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision.'" *Melendez-Arroyo v. Cutler-Hammer de P.R. Co.* (C.A.1, 2001), 273 F.3d 30, 35, quoting *Febres v. Challenger Caribbean Corp.* (C.A.1, 2000), 214 F.3d 57, 60-61.

{¶ 10} The remarks heard by the employee were made in early to mid 2007, yet Northern Trust did not terminate Southworth until February 2009, some 18 months later.

5

More importantly, Northern Trust did not make the reduction-in-force decision until December 2008. At the time the remarks were made by the supervisor, Northern Trust had not yet completed the merger that resulted in the reduction in force. Additionally, there was no indication at the time the remarks were made that the supervisor knew that there would be a reduction in force; hence, the remarks bore no relation to Southworth's termination. It follows that the remarks were too remote in time to be probative of discriminatory intent. See, e.g., *Kirk v. Hitchcock Clinic* (C.A.1, 2001), 261 F.3d 75, 78 (finding that employer's 1996 remarks, made in connection with earlier time-barred discriminatory decision, were not direct evidence relevant to a 1997 employment decision); *Oest v. Ill. Dept. of Corr.* (C.A.7, 2001), 240 F.3d 605, 611 (noting that "temporal proximity is often crucial to the [direct-evidence] inquiry" and that a two-year lapse between a remark and an employment decision "defeat[s] the inference of a 'causal nexus between the remark and decision to discharge'"); *Yates v. Douglas* (C.A.8, 2001), 255 F.3d 546, 549 (remarks too remote in time when made "one to two years" before termination); *Scott v. Suncoast Beverage Sales Ltd., PMBA* (C.A.11, 2002), 295 F.3d 1223, 1227-1228 (remarks too remote in time when made "two and one-half years before the termination").

{¶ 11} Southworth discovered that in November 2008, Northern Trust's human-resources department had produced a list of names, including his, for a possible reduction in force. He claimed that this proved that Southworth's supervisor had known far sooner that

6

there would be a reduction in force, so his remarks about Southworth were much more proximate in time to the rif decision.

{¶ 12} Southworth's supervisor testified, however, that he had not seen the list prepared by the Northern Trust human-resources department and had not participated in any decision-making process that would have placed Southworth's name on the list. When evaluating remarks made by decision-makers, the courts must consider whether those remarks related to the employment decision at issue. There was no evidence that Southworth's supervisor knew at the time he allegedly made the offending remarks that Northern Trust would be engaging in a reduction in force, so they cannot be said to have any bearing on the decision to include Southworth in the rif.

B

{¶ 13} Southworth also claims as direct evidence of discrimination a stated criterion for his termination by Northern Trust—that he had a lower "anticipated future benefit" to Northern Trust than did younger workers who were considered as part of the reduction of force. Calling this phrase a "smoking gun" of discrimination, he argues that as an older worker with few working years left before retirement, he would necessarily have a lower future benefit to the company than a younger worker not so close to retirement age.

{¶ 14} A letter given to Southworth and all other riffed employees at the time of their termination contained an attachment titled "Job Elimination." The attachment gave

7

information on the job titles (but not names) and ages of individuals eligible for and selected for job elimination.[1]  It stated:

{¶ 15}  "Economic conditions require managers to reduce expenses.  An analysis of the functions and partners reporting to the President–Midwestern States was conducted, to determine which jobs or functions could be eliminated consistent with business needs. Employees were selected for job elimination following an analysis of their performance, abilities, and anticipated future benefit to the organization relative to their comparator group."

{¶ 16}  The flaw with Southworth's characterization of the phrase "anticipated future benefit" is that the supervisor who made the decision to terminate Southworth did not use that language as a factor.  The evidence is uncontradicted that Northern Trust gave its managers very specific criteria to evaluate when deciding who to terminate, but left the final termination decision to the managers, subject to review by a rif committee.  None of those criteria used the phrase "anticipated future benefit," and Southworth's supervisor said that he

---

[1]Northern Trust claims that the letter was required by Section 626(f)(1)(H) of the Older Worker Benefit Protection Act ("OWBPA"), Title 29, U.S.Code.  That section amended the Age Discrimination in Employment Act ("ADEA"), to set forth specific requirements for the release of ADEA claims.  Section 626(f)(1)(H) states that if an employer requests an ADEA waiver in connection with an exit-incentive program or other group-termination program, employees are required to receive an "age data chart" or similar information that provides the class or group of employees covered by the program, any eligibility for the program, and any time limits applicable to the program; the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program.

8

did not use the phrase as a criteria for selecting employees to be riffed. If the phrase was not employed as a factor in evaluating who would be riffed, its use in letters sent to announce the rif decision cannot be said to have been a motivating factor in the supervisor's decision to terminate Southworth. It was thus not direct evidence of age discrimination.

{¶ 17} Even had the phrase "anticipated future benefit" been used as one of the criteria for deciding who would be riffed, the phrase itself does not indicate a discriminatory motive. It appeared to be a form of corporate-speak to say that Northern Trust would retain those employees whose performance and abilities would best serve Northern Trust moving forward. Northern Trust used the phrase in conjunction with language couched in terms of "ability" and "performance," suggesting that it took a competitive approach in deciding which employees would best serve it in the future. When an employment decision is based on the exercise of business judgment, the courts will not second-guess it. *McKenzie v. Wright State Univ.* (1996), 114 Ohio App.3d 437, 442, 683 N.E.2d 381; *Smith v. Goodyear Tire & Rubber Co.* (C.A.8, 1990), 895 F.2d 467, 472; *Castleman v. Acme Boot Co.* (C.A.7, 1992), 959 F.2d 1417, 1422.

{¶ 18} Southworth argues that he (and several other witnesses who were not involved in the rif decision) views the phrase "anticipated future benefit" as showing that Northern Trust made a direct comparison of age when evaluating which employees would be included in the rif; thus, a 65-year-old employee would work fewer years than a 40-year-old

9

employee, so he would have a lower "future" benefit to the company. This, he claims, shows that the phrase "anticipated future benefit" is code for purposeful discrimination.

{¶ 19} We disagree. It is uncontradicted that Northern Trust used the phrase in a form letter sent to all riffed employees in all of its affected offices. One other employee riffed from the Cleveland office was only 45 years of age. If the phrase had the meaning that Southworth claims it has, Northern Trust would not have riffed this younger employee because this younger employee would, by Southworth's definition, have a greater future benefit than the portfolio managers who were retained, all of whom were older. Likewise, there was evidence that Northern Trust retained a 75-year-old portfolio manager. Again, employing Southworth's logic would indicate that the 75-year-old employee would have fewer working years remaining than Southworth and hence a lower future benefit, thus belying his claim that the phrase showed purposeful discrimination.

{¶ 20} Southworth's interpretation of the phrase "anticipated future benefit" takes the innocuous word "future" and applies it after the fact to justify a perceived wrong. That Northern Trust made the reduction in force based on whom it believed would be the most productive employee in the future is not direct evidence of age discrimination but a business judgment that the courts should not second-guess. *McKenzie v. Wright State Univ.*, 114 Ohio App.3d at 442, 683 N.E.2d 381; *Smith v. Goodyear Tire & Rubber Co.*, 895 F.2d at 472; *Castleman v. Acme Boot Co.*, 959 F.2d at 1422. It follows that the court did not err by

10

finding that Southworth failed to present any direct evidence of purposeful age discrimination.

## III

{¶ 21}   Having failed to set forth direct evidence of age discrimination, Southworth next argues that he made a prima facie case of age discrimination.

## A

{¶ 22}   In *Barker v. Scovill, Inc*. (1983), 6 Ohio St.3d 146, 451 N.E.2d 807, the court adopted the analytic framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, for use in Title VII cases and modified the elements of a prima facie case of age discrimination:

{¶ 23}   "In order to establish a prima facie case of age discrimination * * * in an employment discharge action, plaintiff-employee must demonstrate (1) that he was a member of the statutorily-protected class, (2) that he was discharged, (3) that he was qualified for the position, and (4) that he was replaced by, or that his discharge permitted the retention of, a person not belonging to the protected class.  Defendant-employer may then overcome the presumption inherent in the prima facie case by propounding a legitimate, nondiscriminatory reason for plaintiff's discharge.  Finally, plaintiff must be allowed to show that the rationale set forth by defendant was only a pretext for unlawful discrimination."  Id. at syllabus.

## B

{¶ 24} Northern Trust concedes that Southworth meets the first three prongs of the prima facie test: he was a member of the protected class (over 40 years of age), was discharged, and was qualified for the position of portfolio manager.

{¶ 25} This case involves a reduction in force in which a new employee is not hired to replace the terminated employee and the terminated employee's duties are spread out among the remaining employees. *Merillat v. Metal Spinners, Inc*. (C.A.7, 2006), 470 F.3d 685, 690. Because a rif necessarily results in the termination of otherwise qualified employees, we have held that "an employer's decision to discharge a qualified, older employee should not be considered 'inherently suspicious' because 'in a RIF, qualified employees are going to be discharged.' " *Ramacciato v. Argo-Tech Corp*., 8th Dist. No. 84557, 2005-Ohio-506, at ¶ 29, quoting *Brocklehurst v. PPG Indus.* (C.A.6, 1997), 123 F.3d 890, 896. In rif cases, the fourth prong of the prima facie test is modified to require the employee to "offer 'additional direct, circumstantial, or statistical evidence tending to indicate that * * * [the employer] singled [him] out * * * for impermissible reasons.' " (Citation omitted.) *Kundtz v. AT&T Solutions, Inc.,* 10th Dist. No. 05AP-1045, ¶ 21, quoting *Dahl v. Battelle Mem. Inst*., 10th Dist. No. 03AP-1028, 2004-Ohio-3884, at ¶ 15. See also *Hoffman v. CHSHO, Inc*., 12th Dist. No. CA2004-09-072, ¶ 24. This prong "may be established through circumstantial evidence that the plaintiff was treated less favorably than younger employees during the reduction-in-force." *Branson v. Price River Coal Co.* (C.A.10, 1988), 853 F.2d 768, 771. "The purpose of the additional evidence requirement is

12

to ensure, in reduction of force cases, that the plaintiff has presented evidence to show that there is a chance the reduction in force is not the reason for the termination." *Asmo v. Keane, Inc*. (C.A.6, 2006), 471 F.3d 588, 593. The burden was thus on Southworth to show that his termination resulted from impermissible considerations of his age.

{¶ 26} After taking a charge against earnings in anticipation of a nationwide reduction in force, Northern Trust concluded that it could eliminate two of the six portfolio-manager positions in its Cleveland office. Both Southworth and a 46-year-old portfolio manager were riffed.

{¶ 27} At the time of the reduction in force, the portfolio managers in the Cleveland office were ages 75, 63 (Southworth), 56, 52, 46, and 41. Three of these portfolio managers (those aged 75, 56, and 52) were employed under contracts after their former employer, Lakepoint Investment Partners, merged with Northern Trust in 2008. Their employment contracts provided for lump-sum payouts in the event they were terminated other than for cause or disability in an amount equal to the pay the employee would have been entitled to had the employees been employed for the stated contractual term. These contracts were all dated October 1, 2008. Two of the contracts ran through December 31, 2011; the third contract (for the 75-year-old employee) ran through December 31, 2009.

{¶ 28} Southworth argued that this left only him and the 41-year-old employee as directly comparable for purposes of the reduction in force. Northern Trust disagrees, arguing that its retention of the 75-year-old portfolio manager belied any allegation that it acted with

13

an ageist intent. We believe that Southworth is entitled to the inference that those employees who were under contract were not similarly treated. Northern Trust decided to make the reduction in force just two months after it signed the contracts with these employees, suggesting that the employees under contract received favorable consideration in the reduction in force. Reasonable minds could conclude that Northern Trust may not have treated the employees under contract the same as those without contracts because it would have been liable under the employment agreements to pay them up to three years in salary had they been riffed. Doing so would have nullified any cost savings associated with the reduction in force. Since Northern Trust cannot directly compare Southworth to those employees who were recently hired under employment agreements, any direct comparison must be limited to Southworth and the 41-year-old employee who had been retained.

{¶ 29} Southworth offered evidence to show that he was a better performer than the 41-year-old. A January 2007 employee review conducted by his supervisor stated that Southworth's investment performance "ranked first among Midwest managers at the end of June." The supervisor praised Southworth for the way he handled the office after another portfolio manager left the company and tried to take clients with him: "Jack has don [sic] an outstanding job in filling the gap, meeting with clients, speaking with them on the telephone and generally pitching in. His efforts have been very meaningful, certainly in some cases determinative, in retaining these clients." Despite the additional workload Southworth

voluntarily took on, he effectively managed his own clients, ranking 20th out of 92 portfolio managers in Northern Trust's midwest region.

{¶ 30} Other evidence showed that Southworth managed a "book of business" that was significantly larger than that managed by the younger portfolio manager. In fact, the younger portfolio manager acknowledged not only that Southworth managed at least $100 million more in assets than he did, but that Southworth's book of business generated more fees for Northern Trust. Having shown that he was a better performer than the younger worker, Southworth satisfied the fourth prong of the prima facie test and raised the inference that he was singled out for impermissible reasons.

C

{¶ 31} The burden thus shifted to Northern Trust to articulate a lawful reason for including Southworth in the reduction in force. *Barker v. Scovill, Inc.* (1983), 6 Ohio St.3d 146, 148, 451 N.E.2d 807. Northern Trust offered employee reviews made closer in time to the reduction in force that showed that Southworth, more than any other portfolio manager, had become recalcitrant in implementing certain Northern Trust investment strategies.

{¶ 32} Out of six portfolio managers considered for the rif, Southworth received the lowest rating: eight points out of a possible 20 points. The employee that Southworth claims should have been riffed scored 15 out of 20 points, ranking first among the six being considered. The supervisor's rationale for Southworth's points total was that Southworth had "not successfully provided the appropriate diversified investment solutions to clients," that he

15

"has not done a good job of introducing external investment solutions," and that he "has not been instrumental in referring and assisting in obtaining new clients." The comparable employee, on the other hand, was noted to have "been involved in the majority of new business opportunities" for the previous two years and was effectively using "diversified investment solution strategy and continuing to work in implementing the strategy with clients and prospects."

{¶ 33} The "diversified investment solutions" referred to Northern Trust's desire to move investment assets "off the desktop," meaning that portfolio managers would relinquish day-to-day management of asset allocation and security selection by transferring those assets to diversified funds that were managed by specialists. Southworth's failure to diversify client assets was a point of contention with his supervisor. In a 2007 performance review, the supervisor noted that Southworth "has not been as pro-active as needed in diversifying client assets." By the supervisor's reckoning, Southworth had moved less than ten percent of the assets he managed off the desk, while the Northern Trust average was closer to 25 percent. This became a point of contention, with Southworth openly critical of Northern Trust's policy of transferring the assets. When Southworth told his supervisor that many of his clients refused to have their assets transferred and incur the tax liability associated with capital gains realized from the transfer, the supervisor found fault with Southworth's ability to sell the clients on the benefits of an asset transfer.

{¶ 34} Northern Trust also claimed that even when Southworth managed to move assets off the desktop, he failed to use the full panoply of investment options provided by Northern Trust. The supervisor told Southworth, "I would continue to emphasize that your responsibility as a Portfolio Manager is to educate your clients about the importance of diversification." The supervisor claimed that this statement made it plain to Southworth that Northern Trust was not concerned just with the number of assets that had been moved off the desktop but in how those assets had been diversified. The supervisor told Southworth that the need to educate clients was "true, not just in regards [sic] to diversification by asset class, but in diversification by utilizing different investment solutions and external products" and that Southworth had the "responsibility of utilizing the full solution set available."

{¶ 35} Northern Trust's criticism of Southworth's inability or refusal to move assets off the desktop was a lawful reason for including Southworth in the reduction in force.

D

{¶ 36} To survive summary judgment, Southworth was required to establish that the reasons offered by Northern Trust for his inclusion in the reduction in force were untrue and merely a pretext for age discrimination. To do this, he must show both that Northern Trust's stated reason was false and that age discrimination was the real reason for his termination. *Chandler v. Dunn Hardware, Inc.*, 168 Ohio App.3d 496, 2006-Ohio-4376, 860 N.E.2d 1042, ¶ 9.

17

{¶ 37} Although conceding that Northern Trust's desire to have portfolio managers move assets off the desktop was "a big item" and that he had been under a "ridiculous amount of pressure" to move the assets, Southworth offered evidence that Northern Trust did not make the same demand on all of its portfolio managers. One of the portfolio managers who worked under an employment agreement said in deposition: "[H]ave I been told to move assets off the desktop? No." The 75-year-old portfolio manager likewise testified that he had been under no pressure to move his assets under management off the desktop and, in fact, that no one at Northern Trust had told him to do so.

{¶ 38} In addition to showing that Northern Trust selectively put pressure on portfolio managers to move assets off the desktop, Southworth offered evidence to show that Northern Trust's directive was, for him, unattainable. Southworth repeatedly told his supervisor that he could not on his own volition transfer certain accounts off the desktop because they were "approval" accounts that required client permission. Most of those clients refused to have their accounts transferred—some because they did not wish to incur tax liabilities from the sale of certain equities, others because they desired hands-on supervision by their portfolio manager. The supervisor told Southworth to redouble his efforts, but at the same time did not place pressure on other portfolio managers. For example, the 75-year-old portfolio manager who had been retained conceded that even if he had been pressured to move assets off the desktop, "[i]t would be impossible" because his clients "don't like a lot of change." This is evidence that Northern Trust treated Southworth differently than other

18

portfolio managers, thus raising the spectre of disparate treatment that negates Northern Trust's claim that it had a legitimate business reason for choosing to rif Southworth. And to the extent that Northern Trust made demands on Southworth (as opposed to other portfolio managers), he is entitled to offer evidence to a jury that Northern Trust imposed an unattainable goal as evidence of pretext because a jury may reasonably view the goal or production quota as an effort to set up an employee for failure. *Denesha v. Farmers Ins. Exchange* (C.A.8, 1998), 161 F.3d 491, 499 (holding the imposition of unattainable production goals on an employee was evidence supporting a jury's finding of discrimination).

{¶ 39} Southworth did offer evidence that he was able to move certain assets off the desktop, and that evidence sufficiently conflicted on the quality of his performance compared to the younger retained portfolio manager to create a triable issue on pretext. When directly compared to the younger portfolio manager who had been retained following the reduction in force, Southworth's numbers were better. Southworth began 2008 with about 70 percent of his book on the desktop and by the end of 2008 lowered that number to about 42 percent. On the other hand, the younger portfolio manager started 2008 with about 65 percent of his book on the desktop and by the end of 2008 lowered that number 45 percent. Southworth achieved this number despite having a much higher percentage of approval accounts (42 percent for Southworth versus 14 percent for the younger portfolio manager).

{¶ 40} Northern Trust disputed the validity of these figures, claiming that they did not include certain cash accounts that had been given to Southworth. The overall numbers,

however, were provided by Northern Trust and made no differentiation between cash and noncash accounts for purposes of evaluating the total percentage of assets under management moved off the desktop. Northern Trust cannot argue that the figures it provided were not an accurate reflection of Southworth's performance. In any event, a trier of fact could find that Southworth's improvement in moving assets off the desktop versus the younger portfolio manager was compelling, given the much higher percentage of approval accounts Southworth had.

{¶ 41} Finally, Southworth offered as evidence of pretext e-mails from Northern Trust showing that his name had been considered for the reduction in force before the company had officially announced that it would make a reduction in force. In November 2008, about one month before Northern Trust publically announced that it would be making in a reduction in force, a Northern Trust human-resources vice president sent an e-mail containing a rif list of names from the Midwest region. The only names from the Cleveland office were Southworth's and his assistant's. The vice president for human resources claimed that the list "did not reflect any personnel decisions around the selection of any individual employees whose positions would be eliminated in connection with the RIF" and that they were just "names on a page." Southworth's supervisor said that he had been unaware of this list at the time he conducted his own independent evaluation of employees to be riffed. Nevertheless, a trier of fact could find it highly suspicious that Southworth was the only Cleveland portfolio manager listed on a reduction-in-force list that had been compiled

20

so far in advance of any official announcement. At no point did Northern Trust explain away the uncomfortable coincidence between Southworth being just a name on the page and his being riffed. It moreover failed to explain why, if the rif lists were "just names," the e-mails accompanying those lists did not inform those who received them of that fact. On this point alone, reasonable minds could find that Northern Trust's explanation lacked plausibility, thus showing pretext for age discrimination.

IV

{¶ 42} Civ.R. 56(C) allows summary judgment to be granted when, after the evidence is viewed in a light most favorable to the nonmoving party, there is no genuine issue as to any material fact and reasonable minds could conclude only that judgment must issue as a matter of law. To establish the heightened fourth prong of the prima facie case for discrimination resulting from a rif, Southworth had to offer additional direct, circumstantial, or statistical evidence tending to indicate that Northern Trust singled him out for impermissible reasons. The evidence offered by Southworth would allow reasonable minds to find that Northern Trust so singled out Southworth and that its stated reasons for terminating him were pretext for purposeful age discrimination. We therefore find that Southworth established a prima facie case of age discrimination and that the court erred by granting summary judgment to Northern Trust.

Judgment reversed

and cause remanded.

21

————

ROCCO, J., concurs.

GALLAGHER, J., concurs in judgment only.