[Cite as *Linson v. Ohio Dept. of Rehab. & Corr.*, 2024-Ohio-1970.]

## IN THE COURT OF CLAIMS OF OHIO

| | |
|---|---|
| KAREN M. LINSON<br><br>    Plaintiff<br><br>    v.<br><br>OHIO DEPARTMENT OF<br>REHABILITATION AND CORRECTION<br><br>    Defendant | Case No. 2022-00700JD<br><br>Judge Lisa L. Sadler<br>Magistrate Holly True Shaver<br><br><u>DECISION</u> |

{¶1} Pursuant to L.C.C.R. 4(D), Defendant's January 12, 2024 motion for summary judgment is now fully briefed and before the Court for a non-oral hearing.

{¶2} Plaintiff brings claims of employment discrimination based on age and disability in violation of state law and a claim of retaliation in violation of federal law. Defendant moved for summary judgment on the grounds that Plaintiff can neither establish a prima facie case nor show that Defendant's legitimate reasons for its employment decisions were pretextual. In support, Defendant submitted: (1) a copy of Karen Linson's deposition, including the exhibits referenced therein; (2) the affidavit of Jessica Casto; (3) the affidavit of Kimberly Bliss; and (4) the Ohio Civil Rights Commission Letter of Determination. In response, Plaintiff argues genuine issues of material fact remain for trial. In support, Plaintiff submitted: (1) the affidavit of Karen Linson; (2) Defendant's February 2, 2022 Administrative Investigation Summary Report; and (3) an August 31, 2021 through September 15, 2021 email exchange among Jessica Casto, Kimberly Bliss, Zachariah Zornes, and James Adkins.

{¶3} Having considered the evidence in a light most favorable to Plaintiff, the Court finds that Defendant is entitled to judgment as a matter of law for the reasons stated below.

**Standard of Review**

{¶4} Motions for summary judgment are reviewed under the standard set forth in Civ.R. 56(C), which states, in part:

> Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law.
>
> No evidence or stipulation may be considered except as stated in this rule.

"[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record before the trial court which demonstrate the absence of a genuine issue of material fact on a material element of the nonmoving party's claim." *Dresher v. Burt*, 75 Ohio St.3d 280, 292, 662 N.E.2d 264 (1996). To meet this initial burden, the moving party must be able to point to evidentiary materials of the type listed in Civ.R. 56(C). *Id*. at 292-293.

{¶5} If the moving party meets its initial burden, the nonmoving party bears a reciprocal burden outlined in Civ.R. 56(E), which provides that "an adverse party may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." It is well-established that it is not appropriate to grant summary judgment unless,

> construing the evidence most strongly in favor of the nonmoving party: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, that conclusion being adverse to the nonmoving party.

*Robinette v. Orthopedics, Inc.*, 10th Dist. Franklin No. 97AP-1299, 1999 Ohio App. LEXIS 2038, 7 (May 4, 1999).

**Relevant Background**

{¶6} Plaintiff, an individual over the age of 40 with disabilities[1], began her employment with Defendant in 2012 as a Registered Nurse (RN) at Pickaway Correctional Institution (PCI).  Linson Aff., ¶ 1.  While at PCI, Plaintiff received positive evaluations and was never disciplined.  *Id.* at ¶ 2.  In 2017, Plaintiff requested that Defendant transfer her to Madison Correctional Institution (MCI) because she wanted a shorter commute from Springfield, Ohio where she and her parents lived.  *Id.* at ¶ 3.  Living closer to her workplace made it easier for Plaintiff to care for her parents who were developing health problems.  *Id.* at 3, 5.

{¶7} After applying, Plaintiff was hired as a second-shift RN at MCI but was shortly thereafter able to transfer to first shift.  *Id.* at ¶ 4.  In 2019, Plaintiff requested and was assigned to be one of two chronic-care nurses at MCI.  *Id.*  MCI has two zones, Zone A and Zone B, and each zone has one nurse who oversees the inmates with chronic conditions.  *Id.* As a chronic-care nurse, Plaintiff continually monitored the inmates' condition(s), including ensuring they attended the necessary appointments and received the necessary testing and treatment. *Id.*  Plaintiff enjoyed the chronic-care position because the work was more interesting and entailed less walking.  *Id.*

{¶8} Throughout her employment, Plaintiff has received satisfactory performance evaluations, and has never been demoted, placed on a performance improvement plan, or suspended.  Linson Depo., p. 66, 112, 122-23, 128-129.  Until 2020, Plaintiff had not been disciplined while at MCI, and was the subject of an administrative investigation once or twice per year.  Linson Aff., ¶ 5, 10.

{¶9} In early 2020, Plaintiff's parents became ill and she began frequently taking time off from work to care for them until their deaths.[2]  *Id.* at ¶ 6.  Plaintiff also used leave for her own health issues.  *Id.* at ¶ 7.  Plaintiff was on leave from November 2020 through February 2021 for a surgical procedure during which complications occurred, and again from August through October 2021 for bereavement leave, having COVID, and for various

---

[1] Plaintiff identified her disabilities as "a major surgery and the mental health conditions of anxiety, stress, and insomnia" in her complaint, but Plaintiff focused on dyslexia as the disability underlying her claim during her deposition.  *See* Linson Depo, p. 91; *see also* Complaint, ¶ 16.

[2] Plaintiff's father died in August 2021 and her mother died in July 2023.  Linson Aff., ¶ 6.

mental health concerns. *Id.* Plaintiff submitted all the appropriate Family Medical Leave Act (FMLA) paperwork when necessary and Defendant approved every request. *Id.* at ¶ 8; Linson Depo., p. 67. While Plaintiff also used personal and sick leave in addition to FMLA leave, she has maintained positive leave balances throughout her employment. Linson Aff., ¶ 8.

{¶10} Kimberly Bliss, MCI's Human Capital Management Senior Analyst, averred that Defendant complied with all federal laws, departmental policies, and institutional procedures with regard to Plaintiff's FMLA leave, disability applications, quarantine periods, and other time off. Bliss Aff., ¶ 1-2. Additionally, Jessica Casto, MCI's Health Care Administrator, averred that she "encouraged Nurse Linson to take additional time off via text message at the time when her father first became gravely ill, and then again when he passed away" because she was "aware of the close relationship she had with her father." Casto Aff., ¶ 1. Moreover, Casto "was trying to assist Ms. Linson in making sure her time off was adequately covered for all the time she had off being that after the passing of her father her FMLA was gone" and "wanted to make sure she was not in danger of discipline during the difficult time she was having with her father's passing." *Id.*

{¶11} When Plaintiff returned to work in February 2021 after having surgery, Plaintiff learned she was reassigned to be a floor nurse. Linson Aff., ¶ 16. Specifically, Casto informed Plaintiff that she was no longer the chronic-care nurse for Zone A because Defendant "needed someone more reliable" in that position. *Id.* at ¶ 15. Kelly Gapen, a younger nurse who had not taken FMLA leave, assumed the chronic-care position. *Id.*

{¶12} During her time as a floor nurse, Plaintiff was required to go between both zones during her shift instead of being assigned to work only one zone. *Id.* at ¶ 16. Plaintiff contends that it is substantially more difficult to work between both zones instead of being assigned strictly to one zone. *Id.* Additionally, when Plaintiff worked weekends during 2020-2022, she was generally the only RN scheduled to work with one LPN; however, on the opposite weekends that Plaintiff did not work, there would generally be three RNs and one LPN scheduled. *Id.* at ¶ 17. Plaintiff averred that this was insufficient nursing coverage and required her to do the work of several nurses. *Id.*

{¶13} In late-2022, Plaintiff was assigned back to chronic-care nursing on a part-time basis. Linson Depo., p. 95. Plaintiff stated that Casto apologized to her for taking

her off chronic-care nursing because "Zach [Zornes] was over the schedule and [Casto] should have been more proactive * * *." *Id.* at 33.  Plaintiff does not dispute that Zornes made the schedules.  *Id.* at 77.  Additionally, Casto averred that, with regard to the nursing assignments, "the working conditions are the same for all staff" and that Plaintiff "is assigned to the same job duties as the other staff on the monthly schedule" and "has the same work assignments as the other staff."  Casto Aff., ¶ 3.

{¶14} Also from mid-2020 until mid-2022, Plaintiff was the subject of many incident reports and was subjected to administrative investigations as a result.  Linson Aff., ¶ 10-12.  While Plaintiff specifically claims she "was investigated at least a dozen times in a two-year period[,]" the situations that the Court details below are limited to those incidents for which Civ.R. 56 evidence was provided.  Linson Aff., ¶ 10.

{¶15} In June 2020, Nurse Cavallo filed a formal incident report claiming that Plaintiff "bullies her and has a negative attitude towards her", as well as "creates a negative atmosphere at work."  Linson Depo., Exh. 12.  Nurse Cavallo further complained that Plaintiff specifically "began asking her a barrage of questions regarding her overtime and how many hours she had worked" and that Plaintiff "is negative and hard to work with because of her poor attitude towards staff."  *Id*.  Related to this incident, Nurse Orr filed a separate report involving Plaintiff which cites workplace violence after she observed handwritten notes in Plaintiff's handwriting that documented Nurse Cavallo's salary and overtime rate. *Id.* Additionally, Nurse Orr "had previously heard Nurse Linson on several occasions speak/complain about Nurse Cavallo and the amount of overtime she works." *Id*.  Plaintiff does not dispute that this conversion with Nurse Cavallo took place and that she believes the way Defendant handles overtime is unfair; however, she does not believe she was disrespectful.  Linson Depo., p. 148.

{¶16} Sometime in 2021, Defendant reprimanded Plaintiff for failing to respond within four minutes to a medical emergency.  Linson Aff., ¶ 13.  While Plaintiff does not dispute that she did not respond within four minutes, she claims that the location of the medical emergency was an appreciable distance from her when the general call for assistance came in and there was already an RN and LPN on scene when she arrived, so her immediate response was not necessary.  *Id*.  In contrast, Plaintiff averred that Nurse Aideyman—a younger nurse who has not taken extended FMLA leave—told

Plaintiff that she was not formally disciplined after failing to respond to a different medical emergency within seven minutes.  *Id*.

{¶17} In June 2021, Nurse Evans filed a formal incident report involving Plaintiff which cites workplace violence after Evans "opened [her] email and noticed an email that [she] had sent [on] 6/23/21 to HCA Casto, and AHCA Zornes about an issue that [she] was having with Nurse Linson had been forwarded to Nurse Linson and then deleted from [Evans's] email" but "at no time did [Evans] forward this email to Nurse Linson nor did [Evans] delete the email from [her] list of sent items."  Linson Depo., Ex. 10.  Evans further reported that

> [t]his email was sent to HCA Casto and AHCA Zornes regarding a complaint that [Evans] had with Nurse Linson's constant attitude towards [her]. This email was sent to "vent" because of the attitude of Nurse Linson.  This is not the first time [Evans] ha[d] had difficulty dealing with aggression from Nurse Linson and had written a complaint in the past that had failed to be investigated.

*Id*.

{¶18} Also in June 2021, Defendant reprimanded Plaintiff for allowing an inmate with an elevated temperature, who later tested positive for COVID, to enter MCI.  Linson Depo, Exh. 13, 15.  While Plaintiff does not dispute that she allowed this inmate to enter, she claims that "most all of the inmates coming into the facility that day from the Corrections Reception Center registered as having a fever" which "could have been because it was summer, the arriving inmates were all crammed into a bus that did not have air conditioning and of course the windows were all closed, and they had all sat in the bus for several hours."  Linson Aff., ¶ 14.

{¶19} In November 2021, Mental Health Administrator III Cruea filed a formal incident report involving Plaintiff after Cruea informed Plaintiff that an inmate needed to be COVID tested to which Plaintiff stated she would "relay the message", but the test was still not completed four days later and Plaintiff had not placed the order for testing. Linson Depo., Exh. 16.  Also in November 2021, Correctional Lieutenant Holton filed an incident report involving Plaintiff after she failed to clean and return nail clippers to their proper location at the end of her shift.  Linson Depo., Exh. 17.

{¶20} In January 2022, Nurse Ngoh filed an incident report after Plaintiff failed to provide him with the shift report before leaving.  Linson Depo., Exh. 18.  Also in January 2022, Nurse Raypole filed an incident report after Plaintiff failed to administer a COVID test to an inmate per an email request.  Linson Depo., Exh. 19.

{¶21} From these incident reports, two resulted in formal discipline for which Defendant gave Plaintiff a written reprimand: the June 2021 incident for allowing an inmate with a temperature to enter MCI and the 2021 incident for failing to respond to the medical emergency within four minutes.  Linson Aff., ¶ 11, 13, 14.

{¶22} Separately, Plaintiff stated that Casto had called Plaintiff "old" on a couple of occasions when describing how she could better handle certain job duties.  Linson Depo., p. 103.  Specifically, Casto had communicated, "Oh, you can do it because you're old. You can handle it, you're old."  *Id.*  On one other occasion when Plaintiff had to carry two heavy bags during a medical emergency across MCI because the "cart" was down, Plaintiff states that Casto jokingly remarked: "I guess somebody will pick you up."  *Id.* at 104-105.  However, Plaintiff had already called and asked someone to pick her up before Casto had made the comment.  *Id.*

{¶23} Additionally, Plaintiff inadvertently received an email from Casto on September 15, 2021, which showed an email thread between Casto and Bliss discussing Plaintiff's leave requests.  *Id.* at 139-140.  Plaintiff specifically references the portion of the thread where Bliss told Casto:

> I just got off the phone with Ms. Linson.  She is going to send me the covid
> test results and I am going to send her disability information.  She is also
> supposed to let me know what leave time to use for last pay period.  I will
> send to you for approval once I get it.

Plaintiff's Memorandum in Opposition, Exh. 4.  In response, Casto asked, "Disability as in like long term medical/mental health disability could possibly separate her down the road disability? Or short term like I'm having surgery disability lol" to which Bliss replied, "Not sure yet."  Casto then stated: "I got excited for a second."  *Id.*

{¶24} Regarding the email thread, Casto averred that "the intention of the email was to assist Ms. Linson in helping her figure out what leave to use for what date of

absence as she had multiple types of leave during a short time period." Casto Aff., ¶ 1. Casto further averred that

> [t]he sentence "Disability as in like long term medical/mental health disability could possibly separate her down the road disability? Or short term like im having surgery disability. Lol" was meant to be a lighthearted way of describing the different types of disability. The statement "I got excited for a second" * * * was actually in reference to the hope [that] Ms. Linson was taking short term disability and coming back to work soon as medical was extremely short staffed and mandating staff multiple times a week. Burnout was very high with nurses and we needed her back as soon as possible.

*Id.*

{¶25} Notwithstanding, Plaintiff filed a charge of discrimination with the Ohio Civil Rights Commission (OCRC) in November 2021. Linson Aff., ¶ 20. After the investigation, OCRC determined that it was "not probable" that Defendant engaged in an unlawful discriminatory practice in violation of R.C. 4112. Defendant's Motion for Summary Judgment, Exh. B. Thereafter, Plaintiff filed a timely complaint in the Court of Claims.

**Law and Analysis**

{¶26} Plaintiff alleges Defendant subjected her to disparate treatment discrimination based on her age and disabilities in violation of R.C. 4112.02. Additionally, Plaintiff alleges Defendant is liable to her for retaliation in violation of the FMLA.

*Discrimination*

{¶27} R.C. 4112.02 provides, in pertinent part, that: "It shall be an unlawful discriminatory practice: (A) For any employer, because of the * * * disability, age, or ancestry of any person, * * * to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any other matter directly or indirectly related to employment." It is well-established that "discrimination actions under federal and state law each require the same analysis." *See Ray v. Ohio Dept. of Health*, 2018-Ohio-2163, 114 N.E.3d 297, ¶ 22 (10th Dist.), citing *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.*, 66 Ohio St.2d 192, 196, 421 N.E.2d

128 (1981); *Little Forest Med. Ctr. v. Ohio Civ. Rights Comm.*, 61 Ohio St.3d 607, 609-610, 575 N.E.2d 1164 (1991).  Accordingly, "Ohio courts may look to both federal and state courts' statutory interpretations of both federal and state statutes when determining the rights of litigants under state discrimination laws." *Id.*

{¶28} To prevail on her discrimination claims, Plaintiff must "[present] evidence, of any nature, to show that an employer more likely than not was motivated by discriminatory intent."  *Mauzy v. Kelly Servs., Inc.*, 75 Ohio St.3d 578, 664 N.E.2d 1272 (1996), paragraph one of the syllabus; *see also Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348-349 (6th Cir.1997) ("The direct evidence and circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both.  If a plaintiff can produce direct evidence of discrimination, then the *McDonnell Douglas-Burdine* paradigm is of no consequence.  Similarly, if a plaintiff attempts to prove its case using the *McDonnell Douglas-Burdine* paradigm, then the party is not required to introduce direct evidence of discrimination.").

{¶29} Plaintiff does not present direct evidence of discriminatory intent.  *See Smith v. Superior Prod., LLC*, 2014-Ohio-1961, 13 N.E.3d 664, ¶ 16 (10th Dist.) ("Direct evidence of discrimination is evidence of any nature, which if believed, is sufficient by itself to show the employer more likely than not was motivated by discriminatory animus in its action."); *see also Southwest v. N. Trust Sec., Inc.*, 195 Ohio App.3d 357, 2011-Ohio-3467, 960 N.E.2d 473, ¶ 6 (8th Dist.) ("Direct evidence does not include stray remarks in the workplace * * * .").  Absent direct evidence, Plaintiff bears the initial burden of establishing a prima facie case of discrimination.  *Turner v. Shahed Ents.*, 10th Dist. Franklin No. 10AP-892, 2011-Ohio-4654, ¶ 11-12. In order to establish a prima facie case of discrimination under the disparate treatment theory, Plaintiff must show that she: "(1) was a member of the statutorily protected class, (2) suffered an adverse employment action, (3) was qualified for the position, and (4) was replaced by a person outside the protected class or that the employer treated a similarly situated, non-protected person more favorably."  *Nelson v. Univ. of Cincinnati,* 10th Dist. Franklin No. 16AP-224, 2017-Ohio-514, ¶ 33; *Sheridan v. Jackson Twp. Div. of Fire*, 10th Dist. Franklin No. 08AP-771, 2009-Ohio-1267, ¶ 5.

{¶30} Defendant argues that Plaintiff cannot establish a prima facie case for either age or disability discrimination because she suffered no materially adverse employment action. Adverse employment actions generally entail a "'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 798 (6th Cir.2004), quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). To be considered adverse, the employer's action "must materially affect the terms and conditions of employment instead of being a mere inconvenience or alteration of responsibilities." *Turner* at ¶ 17. It is well settled that "not everything that makes an employee unhappy or resentful is an actionable adverse action." *Canady v. Rekau & Rekau, Inc.*, 10th Dist. Franklin No. 09AP-32, 2009-Ohio-4974, ¶ 25.

{¶31} Specifically, the employer's action must impact the "terms, conditions, or privileges" of the plaintiff's job in a "real and demonstrable way," and the asserted impact cannot be speculative and must at least have a "tangible adverse effect" on the plaintiff's employment. *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir.2001). Moreover, "[t]he employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id*. at 1239. This limitation is consistent with the basic principle that "Title VII is neither a general civility code nor a statute making actionable the 'ordinary tribulations of the workplace.'" *Id*., quoting *Gupta v. Florida Bd. Of Regents*, 212 F.3d 571, 587 (11th Cir.2000).

{¶32} Plaintiff points to several of Defendant's actions to support her claim that she suffered an adverse employment action. Those actions include two written reprimands, reassignment of job duties which increased job responsibilities, and being subjected to administrative investigations.

{¶33} It is not disputed that Plaintiff did not suffer a reduction in pay or lose any material benefits as a result of Defendant's actions. Furthermore, "[a] written reprimand, without evidence that it led to a materially adverse consequence such as lowered pay, demotion, suspension, or the like, is not a materially adverse employment action." *Creggett v. Jefferson Cty. Bd. of Edn*., 491 Fed. Appx. 561, 566 (6th Cir.2012).

Additionally, "employer investigations into suspected wrongdoing by employees, standing alone, generally do not constitute adverse employment actions." *Arnold v. Columbus*, 515 Fed. Appx. 524, 531 (6th Cir.2013). Moreover, an alteration in work responsibilities does not amount to adverse employment action when unaccompanied by tangible harm. *Davis* at 1244-1245.

{¶34} Plaintiff also points to an email exchange regarding her use of FMLA leave, which she perceives as passing judgment on her and making fun of her disabilities. Initially, the Court notes that discrimination claims and hostile work environment claims are analytically distinct theories of liability with different elements. *Schramm v. Slater*, 105 Fed.Appx. 34, 40 (6th Cir.2004); *Sessin v. Thistledown Racetrack, LLC*, 187 F.Supp.3d 869, 878 (N.D.Ohio 2016). Notwithstanding, the Court finds that this email and its contents do not constitute an adverse employment action. While the email does reference the possibility of disability separation, it is difficult to view such a reference as arising to the level of an adverse employment action given the hypothetical nature and the right to reinstatement that Ohio Admin.Code 123:1-30-01(E) provides in the event an employee is involuntarily separated. *See Blashak* at ¶ 15, citing *Plautz v. Potter*, 156 Fed. Appx. 812, 817 (6th Cir.2005); *Thomas v. Potter*, 93 Fed. Appx. 686, 688 (6th Cir.2004). It is not disputed that Plaintiff continues to be employed by Defendant.

{¶35} In short, there is no evidence that Plaintiff's employment terms, conditions, or privileges were altered in any significant or meaningful way. Accordingly, Plaintiff has failed to establish that she suffered an adverse employment action. Having considered the evidence most strongly in Plaintiff's favor, the only reasonable conclusion is that she has failed to state a prima facie claim for age or disability discrimination.

*Retaliation*

{¶36} Federal law "prohibits employers from discriminating against employees for exercising their rights under FMLA." *Ressler v. AG*, 10th Dist. Franklin No. 14AP-519, 2015-Ohio-777, ¶ 14, *citing* 29 U.S.C. 2615(a)(2). To prevail on her retaliation claim, Plaintiff bears the initial burden of establishing that "(1) she exercised rights afforded by FMLA, (2) she suffered an adverse employment action, and (3) there was a causal connection between her exercise of rights and the adverse employment action." *Id.*

(citations omitted).  "Under the retaliation theory, the employer's motive is relevant because retaliation claims impose liability on an employer that acts against an employee specifically because the employee invoked FMLA rights."  *Id.*, citing *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (C.A.6, 2006).  Defendant argues, as it did above, that Plaintiff cannot support her claim with any adverse employment action.  Defendant also argues that Plaintiff cannot establish a causal connection between her exercise of rights and the adverse employment action.

{¶37} In contrast to a discrimination claim, "Plaintiff's burden of establishing a materially adverse employment action is 'less onerous in the retaliation context than in the anti-discrimination context.'"  *Laster v. Kalamazoo*, 746 F.3d 714, 731 (6th Cir.2014), quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595-596 (6th Cir.2007).  Specifically, "the 'adverse employment action' requirement in the retaliation context is not limited to an employer's actions that affect the terms, conditions, or status of employment, or those acts that occur in the workplace."  *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir.2008), citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2412-14, 165 L.Ed.2d 345 (2006).  Conversely, the prohibition against retaliation instead protects employees from conduct that would have dissuaded a reasonable worker from engaging in protected activity.  *See id.*, quoting *Burlington* at 2415.

{¶38} Plaintiff points to the same actions described above to form the basis of her retaliation claim.  However, these types of incidents do not constitute adverse employment actions in violation of the FMLA.  Specifically, it cannot be said that increased job duties or different office locations would dissuade a reasonable employee from exercising her rights under FMLA.  *See White*, 364 F.3d at 797 (alteration of job responsibilities is not sufficient to constitute an adverse action).  Additionally, Defendant merely investigating the formal incident reports filed against Plaintiff is not an adverse employment action, and only two of the many incident reports against Plaintiff resulted in written reprimands.  *See Ellis v. Shelby Cty. Land Bank Dept.*, 6th Cir. No. 12-6312, 2013 U.S. App. LEXIS 22306 (Oct. 31, 2013) ("An investigation by itself, as opposed to the results of an investigation, does not sound like an adverse employment action.").  Moreover, Plaintiff does not dispute the basis for which Defendant formally reprimanded

her on either of these two occasions.  There is no evidence that further discipline resulted therefrom or that these two written reprimands demonstrate a longstanding pattern of issuing formal discipline, and Plaintiff herself identifies points in time after her use of FMLA leave when she was not subjected to any administrative investigations.  *See Taylor v. Geithner*, 703 F.3d 328, 338 (6th Cir.2013); *McDaniel v. Ohio Dept. of Rehab. & Corr.*, S.D.Ohio No. 2:14-CV-0122, 2015 U.S. Dist. LEXIS 162974 (Dec. 4, 2015).

{¶39} Moreover, these incidents did not dissuade Plaintiff from taking FMLA leave. Instead, the evidence shows that Plaintiff continued to take leave as needed following any alleged adverse action.  The evidence is undisputed that Plaintiff has taken multiple FMLA leaves over the years without issue.  Specifically, Plaintiff took leave in August through October 2021 despite Defendant previously issuing her a written reprimand in June 2021 and removing her from chronic-care nursing.  In short, the actions by Defendant would not dissuade a reasonable worker from exercising her rights under FMLA.  *See, e.g., Bonfiglio v. Toledo Hosp.*, N.D. Ohio No. 3:16CV2163, 2018 U.S.Dist. LEXIS 187204, 29-31 (the court granted summary judgment when the employee continued to use FMLA leave following the alleged adverse employment action). Therefore, the Court finds that Plaintiff has failed to identify an adverse employment action that was taken against her as a result of her use of FMLA leave.

{¶40} For these same reasons, the Court cannot conclude that a causal connection exists between any arguable adverse employment action and Plaintiff exercising her rights under FMLA given Defendant's previous and subsequent approval of Plaintiff's leave requests.  *See Sullivan v. Ikea*, 12th Dist. Butler No. CA2019-09-150, 2020-Ohio-6661, ¶ 66, citing *Halker v. Bob Evans Farms, Inc.,* S.D.Ohio No. 2:13-cv-893, 2014 U.S. Dist. LEXIS 127379 (Sep. 11, 2014) ("An employer's prior approval of FMLA leave and its granting of requests for FMLA leave to employees has been found to rebut the allegation that a causal connection exists between a plaintiff's discharge and his FMLA leave request").  Moreover, Defendant reassigned Plaintiff to chronic-care nursing (the position that Plaintiff desired) in 2022 despite Plaintiff's continued use of intermittent FMLA leave for both her own and her mother's health conditions.  Furthermore, Plaintiff fails to provide any argument or point to any evidence that a causal connection exists between the alleged adverse actions and her taking FMLA leave.  Thus, construing the evidence most

strongly in Plaintiff's favor, the only reasonable conclusion is that she has failed to state a prima facie claim for retaliation because there is no causal connection between any alleged adverse employment action and her FMLA leave requests.

**Conclusion**

{¶41} Having reviewed all the evidence in a light most favorable to Plaintiff, the Court finds no genuine issues of material fact remain for trial in this case. *See Mitchell v. Mid-Ohio Emergency Servs., LLC,* 10th Dist. Franklin No. 03AP-981, 2004-Ohio-5264, ¶ 12, citing *Turner v. Turner*, 67 Ohio St.3d 337, 340, 617 N.E.2d 1123 ("In the summary judgment context, a 'material' fact is one that might affect the outcome of the suit under the applicable substantive law."). For the reasons stated above, the Court finds that Plaintiff failed to establish a prima facie case of employment discrimination based on age or disability in violation of R.C. 4112.02 or retaliation in violation of the FMLA. Consequently, the Court GRANTS Defendant's motion for summary judgment pursuant to Civ.R. 56.

LISA L. SADLER
Judge

[Cite as *Linson v. Ohio Dept. of Rehab. & Corr.*, 2024-Ohio-1970.]

| | |
|---|---|
| KAREN M. LINSON | Case No. 2022-00700JD |
| Plaintiff | Judge Lisa L. Sadler<br>Magistrate Holly True Shaver |
| v. | |
| | <u>JUDGMENT ENTRY</u> |
| OHIO DEPARTMENT OF<br>REHABILITATION AND CORRECTION | |
| Defendant | |

**IN THE COURT OF CLAIMS OF OHIO**

{¶42} For the reasons set forth in the decision filed concurrently herewith, the Court GRANTS Defendant's motion for summary judgment. Judgment is rendered in favor of Defendant. All previously scheduled events are VACATED. Court costs are assessed against Plaintiff. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.


LISA L. SADLER
Judge


**Filed April 10, 2024**
**Sent to S.C. Reporter 5/22/24**